[Cite as *State v. Thacker*, 2024-Ohio-5835.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240299 |
| | | TRIAL NO. B-2305996-A |
| Plaintiff-Appellant, | : | |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| TONY THACKER, | : | |
| Defendant-Appellee. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: 12/13/2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Norbert Wessels*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Schuh & Goldberg LLP* and *Brian T. Goldberg*, for Defendant-Appellee.

**CROUSE, Judge.**

{¶1}     Fourteen years ago, a teenage Tony Thacker was adjudicated delinquent for engaging in conduct that, had he been an adult, would have constituted a nonviolent drug felony. From that day forward, Ohio law imposed a legal "disability" upon Thacker, making it a third-degree felony for him to possess a firearm. Then, in 2023, a nearly 30-year-old Thacker was charged with possessing a weapon while under the disability created by his delinquency adjudication. Thacker contended that the Second Amendment to the United States Constitution protects his right to keep and bear arms, despite his juvenile delinquency adjudication. In other words, he argued that Ohio's weapons-under-a-disability statute was unconstitutional as applied to him.

{¶2}     Under the United States Supreme Court's recent decisions in *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. \_\_, 144 S.Ct. 1889 (2024), Thacker is right—at least on the facts and historical evidence before us in this case. Our nation does have a history and tradition of disarming the dangerous, but nothing in that history resembles the State's attempt to deem Thacker a dangerous person for the remainder of his life, based solely upon a nonviolent juvenile delinquency determination. We therefore affirm the trial court's judgment finding R.C. 2923.13(A)(3) unconstitutional as applied to Thacker and dismissing those charges.

## I. BACKGROUND

{¶3}     On April 16, 2010, 16-year-old Tony Thacker was adjudicated delinquent for conduct which, had he been an adult, would have amounted to complicity to drug trafficking in violation of R.C. 2925.03—a fifth-degree felony for an

adult. Descriptions in Thacker's brief and in the trial court's order suggest that the substance being trafficked was marijuana.

{¶4} More than 13 years later, a now 29-year-old Tony Thacker was arrested and indicted on multiple counts—two of them for having a weapon while under a disability in violation of R.C. 2923.13(A)(3). That provision states that "no person shall knowingly acquire, have, carry, or use any firearm" if that person was previously "adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." R.C. 2923.13(A)(3). The State cited Thacker's 2010 juvenile adjudication as the sole basis for this disability and alleged that, as of the dates in the indictment, Thacker had not been relieved from such disability by operation of law or legal process. Thacker does not contest any of these facts for the purposes of appeal, and we accept the State's allegations in its indictment as true.

{¶5} Thacker moved to dismiss the weapons-under-a-disability charges, arguing that R.C. 2923.13(A)(3), as applied to him, violated the Second and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 4 of the Ohio Constitution. After hearing arguments on the issue, the trial court granted Thacker's motion and dismissed the charges. In its order, the trial court adopted the reasoning articulated by Hamilton County Common Pleas Judge Jennifer Branch in the similar case of *State v. Booker*, Hamilton C.P. No. B-2302415 (Dec. 19, 2023), incorporating that opinion by reference.

{¶6} The State then filed this timely appeal pursuant to R.C. 2945.67.

3

## II. STANDARD OF REVIEW

{¶7} In its sole assignment of error, the State contends that the trial court "erred by finding R.C. 2923.13(A)(3) unconstitutional as applied and dismissing the charges" against Thacker. Where, as here, a trial court dismisses an indictment or charges in an indictment for purely legal reasons, we review its decision de novo. *See State v. Troisi*, 2022-Ohio-3582, ¶ 17; *State v. King*, 2024-Ohio-4585, ¶ 14 (8th Dist.).

{¶8} As the State's assignment of error makes clear, Thacker challenged the constitutionality of R.C. 2923.13(A)(3) not on its face, but only "as applied" to him. An as-applied challenger like Thacker "alleges that the application of the statute in the particular context in which he has acted . . . would be unconstitutional." (Cleaned up.) *Wymsylo v. Bartec, Inc.*, 2012-Ohio-2187, ¶ 22. Thus, we limit our consideration to whether the Second Amendment permitted the State to disarm Thacker on the dates listed in the indictment and under the particulars of his case. Because Thacker's challenge is limited, so, too, is the reach of our holding. A ruling in Thacker's favor will only prevent the challenged statute's "future application in a similar context," but will not "render it utterly inoperative." *See id.*

## III. THE SECOND AMENDMENT

### A. Our Task: The Bruen/Rahimi Test

{¶9} The Second Amendment protects "the right of the people to keep and bear arms." U.S. Const., amend. II. In *Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the United States Supreme Court held that this provision enshrined "an individual right" to possess and use firearms, at least those in common use, and at least for self-defense in the home. That right was incorporated against the states by the ratification of the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010).

4

**{¶10}** "Like most rights, though, the right secured by the Second Amendment is not unlimited." (Cleaned up.) *Rahimi*, 144 S.Ct. at 1897. From its inception, our nation has regulated the possession, use, and carrying of firearms. It is this "historical tradition," the Supreme Court has said, "that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. *Bruen* thus set forth a history-and-tradition test, later refined and clarified in *Rahimi*, directing courts confronted with Second Amendment challenges to ask two questions:

**{¶11}** *First*, we must ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If it does, then "the Constitution presumptively protects that conduct," and we proceed to the next step. *Id.*

**{¶12}** *Second*, the court must assess whether the State has rebutted this presumption by adducing historical evidence that its "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* To identify such a "historical tradition," the State must point to a pattern of analogous regulations in effect at the time of the Country's founding.[1] Despite its backward-looking character, this test is "not meant to suggest a law trapped in amber"—the State need not produce a "'dead ringer' or 'historical twin'" to justify its modern regulatory effort. *Rahimi* at 1897-1898,

---

[1] The Court has noted, in its recent opinions, that there exists an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" as opposed to the more traditional originalist window surrounding the ratification of the Bill of Rights in 1791. *Bruen*, 597 U.S. at 37, citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind.L.J. 1439, 1441 (2002); *accord Rahimi*, 144 S.Ct. at 1898, fn. 1. However, the Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen* at 37; *accord id.* at 36 ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"), quoting *Heller*, 554 U.S. at 614. And because the outcome of this case would not be substantially altered by shifting to a Reconstruction focus (given the relatively late vintage of both juvenile courts and felon-in-possession laws), we focus our historical analysis on founding-era historical sources.

quoting *Bruen* at 30. Instead, it is the State's burden to offer evidence that its "new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.*, quoting *Bruen* at 29.

{¶13} In assessing whether the historical regulations the State offers are "relevantly similar" to a challenged law, a court should be guided by the "principles that underpin our regulatory tradition," which it finds by asking "[w]hy and how" a historical regulation "burden[ed] the right" to keep and bear arms. *Rahimi*, 144 S.Ct. at 1898, citing *Bruen*, 597 U.S. at 26-31. The court can then determine whether the State's challenged regulation "impos[es] similar restrictions" on the Second Amendment right as did its historical forbears, and whether those restrictions were imposed "for similar reasons." *Id.* In drawing these comparisons, however, we must take care "to apply faithfully the balance struck by the founding generation to modern circumstances," without engaging in the sort of "means-end scrutiny" that *Bruen* rejected. *Bruen* at 24, 29, fn. 7.

### B. Recent Second Amendment Decisions

{¶14} The law that Thacker challenged and that the State seeks to uphold, as applied in this case, disarms an adult individual because he was adjudicated delinquent as a juvenile for conduct that amounted to complicity to trafficking marijuana. *See* R.C. 2923.13(A)(3). That disarmament is presumptively permanent and can be terminated only with judicial approval. *See* R.C. 2923.14. To our knowledge, no other court has resolved the constitutionality of such a disarmament post-*Bruen*. We nevertheless look to several recent federal and state decisions for guidance on how to apply the *Bruen* framework to laws like the one at issue here, and how to frame the State's historical evidence.

*1. United States Supreme Court Decisions*

**{¶15}** Prior to 2024, the United States Supreme Court had addressed two types of laws in the modern era. In *Heller* and *McDonald*, the Court had held that laws effectively prohibiting the possession of handguns in the home violated the Second Amendment. *See Heller*, 554 U.S. at 635; *McDonald*, 561 U.S. at 750. *Heller* also struck down a law requiring that firearms be kept inoperable while not in use. *Heller* at 635. Then in *Bruen*, the Court held unconstitutional a New York law that prohibited the public carrying of firearms without a license—which New York would issue "only when an applicant demonstrate[d] a special need for self-defense." *Bruen* at 11.

**{¶16}** The gun laws at issue in these cases were universal in their application—they limited the rights of all (or virtually all) individuals equally. Though sometimes couched as licensure requirements, the laws in *Heller* and *McDonald* limited *every* person's right to possess a handgun in the home. And the public-carry licensure scheme in *Bruen*, which treated one group (the unlicensed) differently from another (the licensed), had the effect of "broadly restrict[ing] arms use by the public generally," subject to a limited exception. *Rahimi*, 144 S.Ct. at 1901, discussing *Bruen*.

**{¶17}** But many of our firearms laws—including R.C. 2923.13(A)(3)—do not affect "the public generally," but only some subset of that public. Such category-specific regulations, which we shall refer to as "categorical" bans or statutes, can operate in different ways. Some categorical bans may require a judge specifically to find that a regulated party should be disarmed, while others may specify some category of persons who may not own guns, without an ex ante judicial determination. In *Heller*, the Court included dicta reassuring courts that many such categorical disarmament laws would remain enforceable, and stressed that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of

7

firearms by felons and the mentally ill." *Heller* at 626. Justice Alito echoed these dicta for a plurality in *McDonald*. *McDonald* at 786 (plurality opinion). Justice Kavanaugh did likewise in his *Bruen* concurrence, which was signed onto by the Chief Justice. *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring).

{¶18} In *United States v. Rahimi*, the Court addressed its first categorical ban, upholding a federal statute that "bar[red] an individual from possessing a firearm" while subject to a domestic-violence restraining order that "include[d] a finding that he pose[d] 'a credible threat to the physical safety' of a protected person." *Rahimi* at 1898, quoting 18 U.S.C. 922(g)(8). To reach this conclusion, the Court applied the clarified *Bruen* framework we have outlined above.

{¶19} Concededly, nothing quite like 922(g)(8) existed at the founding. *See Rahimi*, 144 S.Ct. at 1901. The Court was thus forced to search for analogies at a greater level of generality. It noted that, while "*English* law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups" (emphasis added), by 1791 "state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents" in this country. *Id.* at 1899. What "persisted," however, were "regulations targeting individuals who physically threatened others." *Id.* In particular, "two distinct legal regimes . . . addressed firearms violence": the surety laws and the going-armed laws. *Id.* at 1899-1901.

{¶20} Surety laws were "[w]ell entrenched in the common law" and allowed a complainant, who feared that a particular individual would do them harm, to ask a judge or justice of the peace to require the threatening individual to give a "surety," or bond, before the dangerous individual could go about with a weapon. *Id.* at 1900. The surety laws were not criminal in nature, their prohibitions could generally last up to

8

six months at a stretch, and they often permitted an exception for self-defense. *Id.* Surety laws further required that the complainant proffer evidence showing that they had "reasonable cause to fear" the individual to be disarmed, and offered that individual an opportunity to respond. *Id.* at 1900, quoting Mass.Rev.Stat., Ch. 134, Sections 1 and 16.

{¶21} The "going armed" laws, by contrast, offered an ex post remedy for gun violence. These "laws prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.'" (Alterations in original.) *Id.* at 1901, quoting 4 William Blackstone, *Commentaries on the Laws of England* *149 (J.B. Lippincott Co. 1893) (1765).[2] Because such conduct posed a grave danger to public order, the "going armed" laws "punished [such] acts with 'forfeiture of the arms . . . and imprisonment.'" *Id.*, quoting 4 Blackstone at *149.

{¶22} "Taken together," the Court held, these two historical analogues "confirm[ed] what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 144 S.Ct. at 1901. And these laws did so, the court reasoned, for a purpose and by a means adequately analogous to 922(g)(8). In reaching this conclusion, the Court emphasized three salient similarities between 922(g)(8) and these historical laws.

{¶23} *First*, 922(g)(8) and the surety laws both required an *individual determination* of dangerousness. *Id.* at 1901-1902. However, the Court cautioned that such individualized determinations may not be *necessary* for a disarmament statute to be valid, declining to address whether "the Second Amendment prohibits the

---

[2] Consistent with the United States Supreme Court, we use the standardized star-pagination when citing to Blackstone's *Commentaries*, which persists through most editions, rather than the pagination of the cited edition.

enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901.

{¶24} *Second*, both 922(g)(8) and the surety laws were limited in duration. The surety requirements lapsed of their own force, and 922(g)(8)'s prohibitions applied only while the duration of the underlying domestic-violence restraining order persisted. *Id.* at 1902.

{¶25} *Third*, 922(g)(8) temporarily disarmed those subject to domestic-violence restraining orders, but did not punish them until they violated that disarmament. *Rahimi*, 144 S.Ct. at 1902. This, the Court said, was less severe than the possibility of imprisonment under the going-armed laws, which did not involve an order to disarm prior to conviction. *Id.*

{¶26} Despite these tailoring considerations, the Court's opinion in *Rahimi* also approvingly referenced *Heller*'s dicta, reiterating that at least some categorical firearms prohibitions, "like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902, quoting *Heller*, 554 U.S. at 626, 627, fn. 26.

*2. Federal Appellate Decisions*

{¶27} In the wake of *Bruen* and *Rahimi*, the federal circuit courts of appeals have had frequent occasion to consider the constitutionality of the other "categorical bans" imposed by federal law under 18 U.S.C. 922(g). Among its most contentious provisions is 922(g)(1)—the federal felon-in-possession statute—about which courts have reached sharply divergent conclusions.

{¶28} Several circuits, including the Fourth, Seventh, Tenth, and Eleventh, have upheld the constitutionality of 922(g)(1) without seriously considering its historical pedigree—on the ground either that *Bruen* did not expressly abrogate their

pre-2022 precedents upholding it, or that *Heller*'s dicta approving "longstanding prohibitions on the possession of firearms by" those convicted of felonies or experiencing mental illness controlled. *See, e.g., United States v. Gay*, 98 F.4th 843 (7th Cir. 2024) (upholding application of 922(g)(1) primarily based on *Heller* dicta, without foreclosing the possibility of as-applied challenges); *United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), *vacated*, ___ U.S. ___, 144 S.Ct. 2708 (2024);[3] *United States v. Canada*, 2024 U.S. App. LEXIS 30900, at *3-4 (4th Cir. Dec. 6, 2024) (holding, without substantive analysis, that 922(g)(1) has a plainly legitimate sweep that would include individuals "convicted of a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President").

{¶29} The Eighth Circuit, however, applied the *Bruen* framework to 922(g)(1)'s categorical ban and nevertheless upheld it, stating that "[g]iven the[] assurances by the Supreme Court, and the history that supports them, . . . there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024).[4] Historically, the Eighth Circuit said, legislatures had "prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed," and did so with "no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at 1128. In support of this conclusion, the court cited eighteenth-century colonial laws disarming

---

[3] *Vincent* was vacated by the United States Supreme Court, along with a slew of other 922(g)(1) cases with pending petitions for certiorari, "for further consideration in light of" *Rahimi. Vincent v. Garland*, ___ U.S. ___, 144 S.Ct. 2708 (2024), *vacating* 80 F.4th 1197 (10th Cir. 2023).

[4] The original decision in *Jackson*, like *Vincent*, was vacated and remanded post-*Rahimi. Jackson v. United States*, ___ U.S. ___, 144 S.Ct. 2710 (2024), *vacating* 69 F.4th 495 (8th Cir. 2023). The opinion cited above was the decision on remand.

"Native Americans," "[r]eligious minorities, such as Catholics," and those "who refused to declare an oath of loyalty" to the revolutionary cause. *Id.* at 1126; *see id.* at 1126-1127 (collecting statutes and law review articles).

{¶30} In *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), the Fifth Circuit followed a different path to a similar result. First, that court rejected the government's argument that *Heller*'s or *Rahimi*'s dicta regarding felon disarmament controlled, as those cases neither concerned 922(g)(1), nor contained any "historical analysis of laws forbidding felons from possessing firearms, as required by *Bruen*." *Id.* at 466. The court further rejected the government's proposed rule that any felony conviction could justify disarmament, reasoning that "not all felons today would have been considered felons at the founding," and that such a rule would enable legislatures to undermine the Second Amendment by redefining the definition of a "felony." *Id.* at 469. Ultimately, however, the *Diaz* court upheld the application of 922(g)(1) to the defendant before it, because he had been convicted of at least one founding-era felony (theft), then punishable by death or total estate forfeiture. *Id.* at 468-469. Such harsh penalties, the court opined, evinced a regulatory purpose akin to that behind 922(g)(1), and they accomplished that purpose by "punishing offenders" in a manner equally permanent to the disarmament imposed by 922(g)(1). *Id.* at 469. For the Fifth Circuit, these broad analogies sufficed to sustain the government's application of 922(g)(1) to individuals previously convicted of theft. *Id.* at 472.

{¶31} The Third and Sixth Circuits, engaging in their own historical analyses, have recognized the necessity of allowing as-applied challenges to 922(g)(1) under *Bruen*. An en banc opinion from the Third Circuit represented an early consideration of the felon-in-possession ban post-*Bruen. Range v. Atty. Gen. of the United States*, 69 F.4th 96 (3d Cir. 2023) (en banc), *vacated sub nom. Garland v. Range*, ___ U.S.

___, 144 S.Ct. 2706 (2024).[5] In *Range*, the Third Circuit held that 922(g)(1) was unconstitutional as applied to an individual whose predicate offense was making "a false statement to obtain food stamps in violation of Pennsylvania law." *Id.* at 98. *Range* held that individuals convicted of felony crimes were nevertheless entitled to the protection of the Second Amendment, and that the government had failed to show a relevantly similar historical analogue permanently disarming nondangerous felons. *Id.* at 101-105.

{¶32} The Sixth Circuit recently provided a detailed framework for as-applied challenges to 922(g)(1) in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). While the *Williams* court rejected both the defendant's facial and as-applied challenges to the law, it did so after considering extensive historical evidence and articulating a robust scheme for judging as-applied challenges in this context. The *Williams* court began, like the Eighth Circuit in *Jackson*, by citing a long English and American tradition of legislatively disarming categories of individuals deemed dangerous from before, during, and after the founding era. *Id.* at 650-657.

{¶33} The Sixth Circuit disagreed with the Eighth Circuit's suggestion that such general laws were devoid of any individualization requirement. "Each time" a legislature enacted such a prohibition, the Sixth Circuit noted, a disarmed individual could regain their right to bear arms by "demonstrate[ing] that their particular possession of a weapon posed no danger to peace." *Id.* at 657. The Sixth Circuit's historical survey ultimately led it to conclude "that legislatures may disarm groups of

---

[5] Like *Vincent* and *Jackson*, *Range* was vacated by the Supreme Court and remanded for reconsideration in light of *Rahimi*. *Garland v. Range*, ___ U.S. ___, 144 S.Ct. 2706 (2024). As of this opinion's publication, it is currently pending before the Third Circuit. *See United States v. Brinson*, 2024 U.S. App. LEXIS 23185, at *3 (3d Cir. Sep. 12, 2024) (noting that appellant's "ability to rely on [*Range*] is an open question until *Range* is reconsidered by our Court"). Though vacated, *Range* is included here for its relevant reasoning.

people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663.

**{¶34}** The Sixth Circuit also rejected the principle, accepted by the Eighth, "that courts should simply defer to Congress" on who is and is not dangerous. *Id.* at 660. Such an approach would undermine the historically individualized character of disarmament and "allow legislatures to define away a fundamental right." *Id.* Thus, the Sixth Circuit held, when a defendant brings an as-applied constitutional challenge to 922(g)(1), courts should "focus on each individual's specific characteristics" to determine "whether [that] individual has met his burden to demonstrate that he is not dangerous, and thus falls outside of § 922(g)(1)'s constitutionally permissible scope." *Id.* at 657.

**{¶35}** *Williams* is further informative for its discussion of whether and how a "presumption" of dangerousness might attach to certain criminal conduct. When it came to convictions for "crimes against the person," the court said, the presumption of danger may well be irrebuttable. *See Williams*, 113 F.4th at 658. Such crimes were punishable with death at the founding as a means of "'prevent[ing] existing criminals from repeating their crimes,'" and "eliminat[ing] those too dangerous to have a place in society before the development of prisons." *Id.*, quoting Stuart Banner, *The Death Penalty: An American History* 15 (2009).

**{¶36}** A second class of crimes—those which "pose a significant threat of danger" by putting individuals' safety at risk—also justified a presumption of dangerousness, though one presumably weaker than for crimes against the person. *Id.* at 659. The Sixth Circuit assumed this class would include "drug trafficking." *Id.* And

a third class of crimes "like mail fraud . . . or making false statements," likely would not justify a presumption in most cases. *Id.*

### 3. Ohio Decisions

**{¶37}** Ohio's disarming statute, R.C. 2923.13(A), has seen fewer constitutional decisions. The provision under which Thacker was charged, R.C. 2923.13.(A)(3) (drug felonies) and the provision disarming those convicted of (or adjudicated delinquent for) violent felonies, R.C. 2923.13(A)(2), are most relevant here. Most such cases have not received full merits determinations, and the laws have been upheld under "plain error" standards. *See, e.g., State v. Johnson*, 2024-Ohio-1163 (8th Dist.) (trial court did not commit plain error by failing to dismiss charges against defendant under R.C. 2923.13(A)(2)-(3) sua sponte); *State v. Jenkins*, 2024-Ohio-1094 (5th Dist.) (same for R.C. 2923.13(A)(3) only); *see also, e.g., State v. Ware*, 2024-Ohio-4655, ¶ 15 (1st Dist.) (vacating and remanding a challenge to R.C. 2923.13(A)(3) for reconsideration in light of *Rahimi*); *State v. Payne*, 2024-Ohio-4698, ¶ 82 (10th Dist.) (holding that trial counsel was not clearly ineffective for failing to challenge R.C. 2923.13 under *Bruen*, given "the absence of any binding legal authority declaring these statutes unconstitutional").

**{¶38}** Three Ohio decisions have passed on these statutes de novo: *State v. Windland*, 2024-Ohio-1760 (5th Dist.), *appeal not accepted*, 2024-Ohio-2927; *King*, 2024-Ohio-4585 (8th Dist.); and *State v. Skaggs*, 2024-Ohio-4781 (5th Dist.). The first two cases upheld the constitutionality of R.C. 2923.13(A)(2), which disarms those found guilty of or adjudicated delinquent for *violent* felonies. *Windland* at ¶ 23 and 26; *King* at ¶ 33 and 36. The third upheld the constitutionality of (A)(3), the drug-felony provision at issue in Thacker's case, as applied to an individual with an adult conviction. *Skaggs* at ¶ 31-32.

{**¶39**} The defendant in *Windland* had been previously convicted as an adult of aggravated robbery with a firearm specification. *Windland* at ¶ 23. Disarming him, the Fifth District held, was within our "historical tradition of keeping guns from individuals viewed as dangerous, including felons." *Id.* at ¶ 21. It reached this determination largely by relying on the weight of then-current district court authority upholding the disarming of felons because they could be considered dangerous. *Id.* at ¶ 19. With respect to the defendant's as-applied constitutional challenge, the *Windland* court noted that an individual guilty of a prior aggravated robbery with a firearm and of felonious assault was a presumptively dangerous individual. *Id.* at ¶ 23.

{**¶40**} The Eighth District, in *King*, considered the same statute applied to a defendant who had a prior juvenile delinquency adjudication (rather than an adult conviction) for a violent felony. *King* at ¶ 18. *King* was styled as a facial, rather than an as-applied challenge to R.C. 2923.13(A)(2). *Id.* at ¶ 13 and fn. 1. The Eighth District, like the Fifth, upheld the statute's constitutionality, and it based that decision on dual determinations: (1) that violent felons were dangerous individuals who could be disarmed under *Rahimi*, *id.* at ¶ 27, and (2) that the Second Amendment draws no distinction between adults and juveniles, *id.* at ¶ 28-29. The Eighth District said that the Supreme Court had not *specified* that its holding in *Rahimi* regarding dangerous persons did not apply to juveniles or in juvenile courts. *Id.* It also determined that the purposes of juvenile justice in Ohio, as well as the fact that juvenile cases are not tried before juries, were irrelevant to the Second Amendment issue. *Id.* at ¶ 30-32.

{**¶41**} Finally, in *Skaggs*, a divided panel of the Fifth District voted 2-1 to affirm a weapons-under-a-disability conviction based on a prior conviction for felony heroin possession. *Skaggs*, 2024-Ohio-4781, at ¶ 3 and 6-7 (5th Dist.). Adopting wholesale the Sixth Circuit's historical overview in *Williams*, the *Skaggs* majority

concluded that such a disarmament fell within our nation's history of disarming dangerous individuals.[6] *Id.* at ¶ 20 and 22. And it reinforced its conclusion by citing numerous federal district court decisions—some upholding convictions under 18 U.S.C. 922(g)(1), and others under 922(g)(3) (disarming an individual "who is an unlawful user of or addicted to any controlled substance"). *Id.* at ¶ 24-25. Ultimately, the *Skaggs* majority deferred to the legislature's determination that those in possession of drugs fell "in the 'bad risk' category with alcoholics and 'mental incompetents,'" and accepted that any disarmament under R.C. 2923.13(A) was temporary, because Ohio permits relief from a disability under R.C. 2923.14. *Id.* at ¶ 26 and 28. Judge King vigorously dissented on almost every point. *See id.* at ¶ 33-72 (King., J., dissenting).

### C. A Framework for Addressing Categorical Firearms Bans

**{¶42}** From these sources and the historical evidence they contain, we draw several conclusions relevant to assessing the constitutionality of a categorical ban on firearms ownership.

**{¶43}** *First*, and most obviously, where the State can point to a specific founding-era tradition of legislation analogous to the law it defends, its law will withstand Second Amendment scrutiny under *Bruen*. However, other constitutional provisions—including the Equal Protection Clause—may still prevent the modern reenactment of many founding-era laws. *See Williams*, 113 F.4th at 656 ("Classifying

---

[6] The *Skaggs* court also rejected the defendant's Second Amendment challenge on the ground that "history and tradition . . . support the legislature's power to restrict the Second Amendment right of drug users, alcoholics, or the mentally ill to carry firearms." *Skaggs*, 2024-Ohio-4781, at ¶ 31 (5th Dist.). But there are differences between the facts of *Skaggs* and the case at bar, and the State has not argued in this court that Thacker's conviction falls within such a tradition of disarming those in altered mental states. Because we rely on "the principle of party presentation," we express no opinion on the applicability or existence of such a tradition to the indictment in this case. *See Bruen*, 597 U.S. at 26, fn. 6, quoting *United States v. Sineneng-Smith*, 590 U. S. 371, 375 (2020).

people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868.").

**{¶44}** *Second*, our nation has a "history and tradition" of disarming individuals who pose a particular danger with a firearm. This could include persons who pose an immediate threat to the physical safety of others, or those whose possession of a firearm would be likely to terrify the public. *See Rahimi*, 144 S.Ct. at 1896 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."); *Williams* at 657; *Jackson*, 110 F.4th at 1128.

**{¶45}** *Third*, a legislature may make categorical judgments about who is too dangerous to possess a firearm. Indeed, all the federal and Ohio appellate courts to survey this question have found as much. *Williams* at 657 ("our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous"); *Jackson* at 1128 ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."); *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are dangerous."); *Rahimi*, 144 S.Ct. at 1902.

**{¶46}** Nevertheless, we must acknowledge that from the founding, colonial and state governments disarmed broad groups—often defined in ways that would be wildly unconstitutional today. In 1776, the Continental Congress recommended that the colonial legislatures pass laws that would "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or

who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies, against the hostile attempts of the British fleets and armies." 4 *Journals of the Continental Congress, 1774-1789*, at 205 (Worthington Chauncey Ford Ed. 1906).[7] Massachusetts, Pennsylvania, and New Jersey took them up on their suggestion. *See* Act of May 7, 1776, in 5 *Acts & Resolves, Public and Private, of the Province of the Massachusetts Bay* 479 (1886);[8] An Ordinance Respecting the Arms of Non Associators, 9 Penn.Stat. at Large 11, ch. 729 (July 19, 1776);[9] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo.L.Rev. 249, 264-265 (2020).[10] Connecticut had beaten them to the punch, however, enacting a law in December 1775 to disarm those who were not "friendly to this and the other United Colonies." An Act for restraining and punishing Persons who are inimical to the Liberties of this and the Rest of the United Colonies, &c., in 15 *The Public Records of the Colony of Connecticut* 192 (Charles J. Hoadly Ed., 1890).[11] After independence, North Carolina, Virginia, and Pennsylvania passed laws disarming any who refused to take an oath to the new government. *See id.* at 265; An Act Obliging the Male White Inhabitants of this State to Give Assurances of Allegiance to the Same &c., 9 Penn. Stat. at Large 110, Ch. 756, Section III (June 13, 1777);[12] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist.Rev. 139, 159-160 (2007).[13]

---

[7] Available at https://www.loc.gov/resource/llscdam.lljc004/?st=pdf&pdfPage=205.
[8] Available at https://archives.lib.state.ma.us/items/f38df282-fe69-4a6f-b33f-838780de6e2d.
[9] Available at https://www.palrb.gov/Preservation/Statutes-at-Large/View-Document/17001799/1776/0/act/0729.pdf.
[10] Available at https://scholarship.law.uwyo.edu/wlr/vol20/iss2/7/.
[11] Available at https://archive.org/details/publicrecordsofc015conn/page/192/mode/2up.
[12] Available at https://www.palrb.gov/Preservation/Statutes-at-Large/View-Document/17001799/1777/0/act/0756.pdf.
[13] Available at https://www.jstor.org/stable/27641432.

**{¶47}** Catholic "papists" were likewise liable to be disarmed in Pennsylvania and Virginia, based on bigoted fears regarding their alleged dual loyalty and risk of rebellion. *Williams*, 113 F.4th at 653. And Native Americans were often prevented from getting guns in the colonies for similar reasons. *Id.* at 652-653; *Jackson*, 110 F.4th at 1126, citing Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 L. & Hist.Rev. 567, 578-579 (1998); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

**{¶48}** As the Sixth Circuit stressed, all these laws represented bigoted categorical, class-wide determinations that the disarmed groups would pose a threat to the public safety if permitted to bear arms. *Williams* at 650-657; *see also Kanter* at 458 (Barrett, J., dissenting).

**{¶49}** *Fourth*, such legislative determinations regarding who is too dangerous to possess a weapon are subject to careful judicial review. Although the legislature may make some broad determinations in this regard, the courts may not accept those determinations blindly, as "complete deference to legislative line-drawing would allow legislatures to define away a fundamental right." *Williams* at 660. If the legislature had the final word on who was and was not "dangerous," it could effectively disarm the bulk of a state's adult population by, for example, defining the class of "dangerous" persons to include anyone who has received a speeding ticket. But the "very premise of constitutional rights is that they don't spring into being at the legislature's grace." *Id.* at 661; *accord Heller*, 554 U.S. at 636 (noting that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table" for the legislature); *Range*, 69 F.4th at 102-103 (rejecting "extreme deference" to legislatures because it would give them "unreviewable power to manipulate the Second Amendment by choosing a label" (Cleaned up.)); *Diaz*, 116 F.4th at 466 (rejecting

deference to legislative definition of Second Amendment's scope). However unpleasant the task, to enforce the Bill of Rights, courts must police whether a particular legislative disarmament has or has not limited itself to truly "dangerous" individuals.

{¶50} *Fifth*, this critical review extends to felony-based bans, even those seemingly covered by *Heller*'s and *Rahimi*'s dicta. Given *Bruen*'s strong emphasis on the need for judicial oversight, rejection of legislative deference, and placement of the burden squarely on the government's shoulders, these dicta, and the correlate *Bruen* concurrences, simply cannot sustain the strong reading given them by courts like the Eleventh Circuit and the Eighth and Fifth Districts in our state. *See, e.g.*, *Dubois*, 94 F.4th at 1291-1293; *King*, 2024-Ohio-4585, at ¶ 25-27 (8th Dist.); *Windland*, 2024-Ohio-1760, at ¶ 15 (5th Dist.); *Skaggs* 2024-Ohio-4781, at ¶ 16 and 19 (5th Dist.). Rather, we believe, similar to the *Williams* court, that the dicta in *Heller* and *Rahimi* more naturally suggest that longstanding bans on the possession of firearms by those convicted of felonies and those who are suffering from serious mental illness are likely to fall within our historical tradition of disarming those reasonably considered dangerous with a gun. *See Williams*, 113 F.4th at 647-648; *see also id.* at 657 ("Because, as we discuss below, most applications of § 922(g)(1) are constitutional, the provision is not susceptible to a facial challenge."). Such laws were not before the Supreme Court in *Heller*, *Bruen*, or *Rahimi*—and to read these asides as binding would undercut the reasoning actually necessary to resolve those cases. *See id.* at 645; *Diaz* at 466; *Skaggs* at ¶ 38-39 (King, J., dissenting) (noting that *Rahimi* could not have suggested that legislatively-defined categorical disarmaments fell outside *Bruen*'s history-and-tradition test).

**{¶51}** *Sixth*, to be analogous to founding-era laws, a dangerousness-based firearms prohibition may last roughly as long as the danger it seeks to prevent. During the founding era, when individuals were determined to be dangerous for some transitory reason, the period of their disarmament or disability was generally limited. A justice of the peace's determination that an individual must post a weapons-based suretyship bond lapsed after six months. *Rahimi*, 144 S.Ct. at 1900. And the "going-armed" laws punished with a term of imprisonment and required the forfeiture of the *particular* arms used—but did not impose an indefinite term of disarmament. *Range*, 69 F.4th at 105. While he obviously could not keep or bear any arms in his cell, upon his release from jail the convicted affrayer would have been free immediately to purchase another musket or flintlock, even if his prior weapon had been forfeited. *Id.*

**{¶52}** Thus, in *Rahimi*, the Supreme Court emphasized not only that 922(g)(8) prohibited gun ownership by certain dangerous individuals, but that it did so only while their domestic-violence restraining orders continued. *Rahimi* at 1902. Such orders would, after a period, terminate of their own force (in *Rahimi*, two years after his release). *Id.*; Tex.Fam.Code 85.025(b-2), (c)(3). To continue beyond that date, a court would have needed to once again find Rahimi dangerous. This and similar statutory schemes mirror founding-era surety laws by ensuring a close fit between the period in which an individual poses a danger and the period for which that individual will be disarmed.

**{¶53}** *Seventh*, and finally, where the basis for deeming an individual dangerous is presumed to continue indefinitely, so may the disarmament—so long as the disarmed individual is given the opportunity to lift their disability in the event of changed circumstances or inaccurate classification. As the *Williams* court pointed out, founding-era legislatures frequently utilized presumptions of dangerousness that

lasted indefinitely, subject to individualized relief from the disability. *Williams*, 113 F.4th at 653-654. But, when a founding-era disarmament was presumptively permanent, it was because the *reason* for that disarmament could be presumed to continue indefinitely. Some founding-era states disarmed Catholics, largely on the basis of bigoted fears regarding Catholic dual-loyalty. And the young states, urged on by the Continental Congress, disarmed "disaffected" persons whose sympathies lay with England, rather than America during the war. The reasons behind these disabilities (i.e., Catholicism and English loyalty) were likely to persist, unless the disarmed individuals changed their tunes. Why would founding-era legislatures believe these sentiments *would* change, absent individual proof that they *had*? Thus, if we accept these founding-era assumptions about who was "dangerous," then we must acknowledge that the "danger" these groups posed was likely to persist indefinitely absent evidence to the contrary, and therefore so could their disarmament.

**{¶54}** Building upon these premises, we provide the following framework for assessing the constitutionality of categorical, legislative disarmament statutes: In determining whether a particular disarming statute violates the Second Amendment, a court must first look to determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does, then "the Constitution presumptively protects that conduct." *Id*. To rebut that presumption the State must demonstrate that its restriction falls within our country's history and tradition of firearms regulations. That history and tradition includes a longstanding practice—dating back to before and during the founding era—of legislatures disarming those they determine to be dangerous, at least for a time. However, as *Rahimi* and *Williams* illustrate, disarmaments were not used with abandon; they were focused on the danger at hand and tailored to prevent that danger. Thus, the constitutionality of a categorical,

23

class-wide disarmament that is predicated upon the "dangerousness" of the class will generally depend upon (1) whether the class of persons disarmed can reasonably be presumed dangerous with a firearm, and (2) whether the duration of the disarmament is realistically tailored to the danger persons in that class pose.

{¶55} Passing this test will likely be easy where, as in *Rahimi*, the challenged law presupposes that a court has already determined a particular individual poses a threat to others' safety, and where that individual's disarmament lasts roughly as long as the continued danger they pose. But where the determinations of dangerousness are less individualized, or where the duration of disarmament goes beyond the reasonable presumption of danger, the State will need to rely upon historical analogy to justify its variances.

{¶56} And we hasten to reiterate, in accord with *Bruen*, that the State need not rely upon this dangerousness framework to justify *every* regulation. If, in a particular case, the State can point to a tradition of firearms regulations that are specifically and relevantly similar to its present-day law, that law will likely satisfy the Second Amendment. Indeed, historical tradition may justify disarmament of certain classes of persons without any need to rely upon broad analogies to the limitations of suretyship laws or the rationale behind loyalist disarmament. But where the State cannot cite a more precise regulatory tradition in which it operates, the rubric outlined above provides a Second Amendment backstop, rooted in our nation's history and tradition, and drawn from the rationales expressed in *Bruen*, *Rahimi*, and *Williams*.

### IV. THIS CASE

{¶57} We turn now to apply this framework to Thacker's case and to R.C. 2923.13(A)(3), as applied to him.

**{¶58}** This case involves neither a convicted felon, like *Williams*, nor an individual subject to a domestic-violence restraining order, like *Rahimi*. Rather, this case involves a very specific question: whether the State may disarm (1) an adult individual (2) based upon a prior juvenile delinquency adjudication, (3) for conduct which, had he been an adult, would have constituted felony complicity to trafficking in marijuana (4) for life, subject to Ohio's disability-removal procedures.

**{¶59}** First, we hold that the statute burdens conduct protected by the Second Amendment. This statute, R.C. 2923.13, prohibits an individual subject to one of the listed disabilities from owning *any* firearm at all. As the State conceded in its brief, the right to possess *some* sort of firearm plainly falls "within the confines of Second Amendment protection."

**{¶60}** We next turn to prong two: whether R.C. 2923.13(A)(3), as applied here, falls within our history and tradition of firearms regulations. The State offers several justifications for the application of R.C. 2923.13(A)(3) in this case, the majority of which boil down to three lines of argument. First, it says, our history and tradition of firearms regulation has always permitted disarming juveniles. Second, the State argues, like the Eighth Circuit, that the language of *Heller* and an unbroken history of regulation demonstrate that the State may disarm an individual who has been convicted of a felony. Within this line of argument, the State also contends that, because juvenile courts did not exist in 1791 and juveniles over seven could be tried as adults at that time, we should analogize modern juvenile delinquency determinations to founding-era felony convictions. Third and finally, the State argues at several points that R.C. 2923.13(A)(3) represents a valid legislative judgment that juveniles adjudicated delinquent for drug offenses pose a danger to the community, and thus can be disarmed. We will address all three in turn.

### A. The "Juvenile" Rationale

**{¶61}** We begin with the State's easiest argument to dispatch. The State spends nearly five pages of its brief offering historical evidence that, since the founding, individuals "under the age of majority were considered untrustworthy with dangerous weapons and their 'Second Amendment' rights could be abrogated on that basis alone." We express no opinion on the accuracy of these historical representations, because they are irrelevant in this case. Even assuming that the State *could* categorically and without limitation disarm those beneath the age of majority, that is not what the State has done here.

**{¶62}** While Thacker was a minor at the time of his 2010 delinquency adjudication, he is not a minor anymore. In this case, we must resolve whether the State could limit Thacker's right to bear arms on the dates listed in the indictment: September 19 and October 20, 2023. On those dates, Thacker was 29 years old. A 29-year-old was not a minor at the founding or today, and the State has produced no evidence that our country has a history or tradition of disarming individuals because they are 29 years old.

### B. The "Felony" Rationale

**{¶63}** The State's next argument has two parts: (a) that it may disarm any person who has been convicted of a felony, and (b) that, for Second Amendment purposes, juvenile delinquency adjudications are no different from criminal convictions.

**{¶64}** As the sharply divided state and federal cases illustrate, the question of whether a state may categorically disarm *all* felons or merely those determined to be dangerous is an open one. And although *Rahimi* reiterated *Heller*'s dicta that felon-in-possession bans are "'presumptively lawful,'" *Rahimi*, 144 S.Ct. at 1894, quoting

26

*Heller*, 554 U.S. at 626, courts across the country have struggled to understand the force and scope of this apparent concession. *Compare*, *e.g.*, *Range*, 69 F.4th at 103-104 (3d Cir.) (en banc) (suggesting that, despite *Heller* dicta, the federal felon-in-possession ban did not represent a founding-era tradition), *and Diaz*, 116 F.4th at 466 (5th Cir.) (holding *Heller*'s and *Rahimi*'s dicta were not binding), *with Williams*, 113 F.4th at 663 (6th Cir.) (holding that, because many felons will also be dangerous, our "nation's historical tradition confirms *Heller*'s assumption that felon-in-possession laws are 'presumptively lawful[,]'" subject to as-applied challenges), *with Jackson*, 110 F.4th at 1125 (8th Cir.) (relying upon the "assurances by the Supreme Court" to conclude "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"), *and* Dubois, 94 F.4th at 1293 (11th Cir.) (holding that, because it did not displace *Heller*'s assurances, "*Bruen* could not have clearly abrogated [the Eleventh Circuit's] precedent upholding § 922(g)(1)").

**{¶65}** The State has offered minimal historical evidence to support its claim that a blanket prohibition on all felons possessing firearms comports with our nation's history and tradition of firearms legislation. It cannot provide a single founding-era law permitting the disarmament of felons qua felons. This may not be surprising—both the academy and the bench have struggled to offer an obvious historical pedigree for categorical felon-in-possession bans. *See*, *e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009)[14] ("so far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms"); Royce de R. Barondes, *The Odious Intellectual Company of Authority*

---

[14] Available at https://repository.uclawsf.edu/hastings_law_journal/vol60/iss6/7/.

*Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex.Rev.L. & Politics 245, 299 (2021)[15] ("Our brief review of the Founding-Era restrictions on criminals' firearms possession, post sentence, has revealed restrictions that are not analogous to the contemporary firearms bans imposed on persons with prior felony convictions."); *see also Range*, 69 F.4th at 112-113 (Porter, J., concurring) ("the Supreme Court will have to square its history-driven test with its concurrent view that felon gun restrictions are presumptively lawful"); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws."). And history shows that, where disarmament did follow wrongdoing in the founding era, the disarmed could often have their rights restored. *Compare* Greenlee, 20 Wyo.L.Rev. at 269 (noting that "prohibited persons in the founding era—including armed insurrectionists—regained their rights once they no longer posed a violent threat").

{¶66} Lacking direct historical evidence to support its categorical rule, the State argues a more inferential proposition: because many felonies—including some nonviolent offenses—were punished by death in 1791, the government must have been able to inflict the lesser punishment of disarmament for such crimes. However, as the *Williams* court noted, those convicted of felonies generally "don't lose other rights guaranteed in the Bill of Rights even though an offender who committed the same act in 1790 would have faced capital punishment." *Williams*, 113 F.4th at 658. Further, the overlap between capital punishment and felony conviction in early America is a

---

[15] Available at https://www.trolp.org/blog/2021/9/16/the-odious-intellectual-company-of-authority-restricting-second-amendment-rights-to-the-virtuous.

disputed issue. *See Kanter* at 458-459 (Barrett, J., dissenting). And, even if founding-era felons *were* always executed, it is not clear why the State's greater-includes-the-lesser argument should apply to *all* felonies today, and not merely those with founding-era analogues.

**{¶67}** In any event, *Bruen* directs us to look for relevantly similar regulations in our nation's history and tradition, not broad theoretical inferences from the nature of felony punishment. It is difficult to understand how "the Government's attempt to disarm" Thacker is "'relevantly similar' to earlier statutes allowing for execution." *See Range* at 105.

**{¶68}** Fortunately, we need not resolve the fate of all felon-in-possession bans in this case. Even assuming that the State is correct, and that it may constitutionally prohibit each and every person convicted of a felony from possessing a firearm, that would not mean it could disarm Tony Thacker. Thacker had not been convicted of a felony at the time of the events described in his indictment. He had only been *adjudicated delinquent* for conduct that *would have been* a felony, had he been an adult.

**{¶69}** This distinction matters. The juvenile justice system is not a mere outgrowth of the adult criminal justice system; juvenile justice is "'rooted in social welfare philosophy rather than in the *corpus juris*.'" *In re C.S.*, 2007-Ohio-4919, ¶ 66, quoting *Kent v. United States*, 383 U.S. 541, 554 (1966). Delinquency "'has not been declared a crime in Ohio, and the Ohio juvenile act is neither criminal nor penal in its nature.'" *Id.* at ¶ 67, quoting *State v. Joiner*, 28 Ohio Dec. 199, 202, 20 Ohio N.P. (N.S.) 313, 319 (Geauga C.P. 1917).

**{¶70}** In the 1960's and 70's, courts and legislatures *did* begin to impose quasi-criminal procedural safeguards on these civil juvenile proceedings. *See, e.g., In re*

*Gault*, 387 U.S. 1 (1967) (right to counsel); *In re Winship*, 397 U.S. 358 (1970) (right to proof beyond a reasonable doubt). But the rights provided to an accused juvenile did not come from the same source as their criminal procedure kin. Many, such as the right to counsel, "flow[ed] to the juvenile through the Due Process Clause of the Fourteenth Amendment, not the Sixth Amendment," which is the source of the right for adult criminal defendants. *In re C.S.* at ¶ 79, quoting *In re Gault* at 41.

**{¶71}** Notably absent from juvenile proceedings is another Sixth Amendment guarantee: the right to trial by jury. *See State v. Hand*, 2016-Ohio-5504, ¶ 19, citing *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (plurality opinion). Based upon the fundamental differences in the objectives of juvenile adjudication and adult criminal process, state and federal courts have held that juries are unnecessary in juvenile delinquency proceedings. *See In re Agler*, 19 Ohio St.2d 70, 79 (1969) ("we can perceive no benefit worthy of destroying a juvenile's traditional entitlement to special status which might accrue to an alleged delinquent from a jury trial"); *McKeiver* at 550 (plurality opinion).

**{¶72}** Again, the State argues that a categorical, felon-disarmament rule existed at the time of the founding. But if such a rule existed, it came with the inherent proviso that, for the founding generation, felony adjudication was utterly inseparable from the notion of trial by jury. "No idea was more central to our Bill of Rights than the idea of the jury." Akhil Reed Amar, Foreword, *Sixth Amendment First Principles*, 84 Yale L.J. 641, 681 (1996).[16] Juries were and are "the democratic branch of the judiciary power"—deemed by leading anti-federalists, whose agitations birthed the Bill of Rights, to be "more necessary than representatives in the legislature" in securing

---

[16] Available at https://openyls.law.yale.edu/handle/20.500.13051/5353.

liberty. *"A Farmer" in* 1 *Debates on the Federal Judiciary: A Documentary History* 34, 34 (Bruce A. Ragsdale Ed., Fed. Judicial Ctr. 2013).[17] Thomas Jefferson referred to jury trials as "trials by the people themselves." Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789), *Founders Online*, Natl. Archives.[18] Indeed, Jefferson had cited restrictions on the jury-trial right as one of the colonists' grievances against the crown which had fired independence. *See* Declaration of Independence, July 4, 1776 (objecting that the king "subject[ed] us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his Assent to their Acts . . . depriving us in many cases, of the benefits of Trial by Jury"). And Jefferson was not alone in considering juries central to the American Republican project; the right to a criminal jury was the "only right secured in all state constitutions penned between 1776 and 1787." Amar, 84 Yale L.J. at 681; *accord Duncan v. Louisiana*, 391 U.S. 145, 153 (1968). The framers of the United States Constitution and Bill of Rights must have felt similarly, as they gave the right to a jury trial in criminal cases *double* protection. *See* U.S. Const., art. III, § 2; U.S. Const., amend. VI.

**{¶73}** "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government." *Duncan* at 155. The founders valued the institution of the jury in part because it offered a democratic override—one that Madison and Jefferson had hoped would serve "as a 'guardian' of freedom, 'and impenetrable bulwark' of liberty." Akhil Reed Amar, *The Words That Made Us: America's*

---

[17] Available at https://www.fjc.gov/content/debates-federal-judiciary-documentary-history-volume-i-1787%E2%80%931875.

[18] https://founders.archives.gov/documents/Jefferson/01-14-02-0422 (originally published in 14 *The Papers of Thomas Jefferson*, *8 October 1788–26 March 1789*, at 676-679 (Julian P. Boyd.Ed., 1958)).

*Constitutional Conversation, 1760-1840*, at 450 (2021). The jury, then as now, provided "democratic authorization" to state-sanctioned punishment by acting as "an additional democratic check on the back end of the criminal process, in which a group of citizens decides that a particular defendant deserves punishment under the general law that those citizens' representatives enacted." Daniel Epps & William Ortman, *The Informed Jury*, 75 Vand.L.Rev. 823, 872 (2023).[19]

**{¶74}** A felony conviction, at the founding, meant a jury trial. And this coincidence was no mere accident of history; it was fundamental to how the founders conceived of their American project. Thus, if those who ratified the Second Amendment in 1791 believed they could disarm anyone found to have committed a felony, they certainly assumed that a finding of guilt would be made by a jury. The State bases much of its argument for a per-se-felony-disarmament rule on the fact that founding-era felonious conduct could subject the defendant to execution or "civil death." But no state in 1791 believed it could execute a defendant—whether he was seven, 17, or 70—without first according him a jury trial. Thus, without the availability of the jury safeguard, juvenile adjudications are just not "relevantly similar" to founding-era convictions for felony crimes. Even if we assume, as the State suggests, that the historical record showed a tradition that would support universal felon disarmament, that tradition would not reach jury-less juvenile delinquency adjudications.

**{¶75}** Further, the Ohio Supreme Court has clearly held that a juvenile delinquency adjudication *cannot* be used as a surrogate for an adult conviction. In *State v. Hand*, the court considered whether a juvenile adjudication could count as a

---

[19] Available at https://scholarship.law.vanderbilt.edu/vlr/vol75/iss3/3/.

criminal conviction for the purpose of sentence enhancement. The court held that the Due Process Clause prohibited treating juvenile adjudications as if they constituted adult convictions. *Hand*, 2016-Ohio-5504, at ¶ 38. To do so was "inconsistent with Ohio's system for juveniles, which is predicated on the fact that children are not as culpable for their acts as adults and should be rehabilitated rather than punished." *Id.* Further, while prior convictions can be used as sentence enhancements "because the prior process involved the right to a jury trial," juveniles "are not afforded the right to a jury trial," and a juvenile adjudication is therefore "not a conviction of a crime and should not be treated as one." *Id.*

{¶76} Subsequent cases from the Ohio Supreme Court, which permitted the use of juvenile adjudications for the purpose of R.C. 2923.13 under the Due Process Clause, do not change *Hand*'s dispositive character with respect to the State's per-se-felon-disarmament-for-juveniles theory. For example, in *State v. Carnes*, 2018-Ohio-3256, the Ohio Supreme Court was careful to clarify that the weapons-under-a-disability statute "does not deem the juvenile adjudication to be an adult conviction." *Id.* at ¶ 19. And *State v. Buttery*, 2020-Ohio-2998, permitted the use of a juvenile adjudication only to the extent that it "is not treated as equivalent to a conviction and its use is not based on its reliability." *Id.* at ¶ 19.

{¶77} Finally, the State protests that, at the founding, juveniles were *not* afforded the same constitutional protections as adults, and such protections therefore cannot be required by the Second Amendment. But, if the State claims that it can disarm Thacker simply because it can disarm a convicted felon, it cannot then argue, under that very same per se rule, that less than founding-era felony procedures will do. Further, as the State's own brief points out, "children beyond the age of seven were subjected to arrest, trial, and punishment *like adult offenders*" (emphasis added), if

33

they were to be tried at all. Thus, when children at the founding *were* convicted of a felony, that conviction came from a jury.

**{¶78}** For all these reasons, even if we assume the State's premise that the founders believed they could disarm each and every felon, the State still cannot prevail. The State's argument that we may simply substitute juvenile adjudications for founding-era felony convictions runs afoul of both founding-era history and Ohio Supreme Court precedent. Therefore, R.C. 2923.13(A)(3), as applied to Thacker, cannot be sustained on the State's per se felon-disarmament rationale.

### C.  The "Danger" Rationale

**{¶79}** Just because individuals adjudicated delinquent do not fall within any tradition of per se felon disarmament, however, does not mean that they cannot be disarmed. As many cases note, and as we have discussed above, our nation has a long history of disarming classes of individuals deemed by the legislature to be dangerous. Both parties in this case concede or assume that, under at least *some* circumstances, dangerous individuals may be disarmed. And the United States Supreme Court endorsed a similar view in *Rahimi*, holding that when "an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 144 S.Ct. at 1901; *accord Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (noting that historical evidence "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous").

**{¶80}** The State contends that R.C. 2923.13(A)(3) is just such a danger-disarmament law. It argues that the legislature is entitled to deference in its determinations of who is and is not dangerous, and that the legislature has permissibly deemed those who have engaged in the felonious drug conduct described in R.C. 2923.13(A)(3) to be dangerous, regardless of whether that conduct was engaged in by

a juvenile or an adult. As explained above, we assess these arguments by asking (1) whether the class of persons disarmed can reasonably be presumed dangerous with a firearm, and (2) whether the duration of the disarmament is realistically tailored to the danger persons in that class pose.

### 1. Determination of Dangerousness

{¶81} To disarm persons whose firearm possession poses a danger to the community, the state must first determine how to separate such dangerous individuals from the nondangerous. This might occur, as was the case in the suretyship laws and in *Rahimi*, through case-by-case and person-by-person adjudications, which would yield individualized findings as to whether the individual to be disarmed posed a danger to others. However, as noted above, we also have a historical tradition of legislative dangerousness determinations, which disarmed individuals based on some legislatively determined proxy for a dangerousness determination.

{¶82} The State contends that the adjudications listed in R.C. 2923.13(A)(3) are such a proxy for dangerousness, and that we should defer to the legislature's determination on this issue. But, as emphasized in *Heller* and *Bruen*, legislative deference in this area must be limited. The State cannot legislate its way around the Second Amendment.

{¶83} To determine whether R.C. 2923.13(A)(3)'s classification, as applied to Thacker, could constitute an adequate proxy for dangerousness, we would need to answer two difficult questions: (1) whether complicity to marijuana trafficking is the sort of conduct that could justify a presumption of danger, and (2) whether the juvenile adjudication here was an adequate vehicle from which to draw conclusions about the adult Thacker.

**{¶84}** While courts regularly link drug sales and danger, it is not clear that marijuana trafficking involves the kind of danger with which the Second Amendment is concerned. *See United States v. Stone*, 608 F.3d 939, 947, fn. 6 (6th Cir. 2010) (noting that "drug trafficking . . . poses a danger *to the community*," while "drug dealers do not necessarily pose [an] immediate risk of serious violence" (Emphasis added.)). *But see Williams*, 113 F.4th at 659 (accepting in dicta and without significant examination the dangerousness of drug trafficking).

**{¶85}** Nor is it clear how much an adjudication of juvenile status can tell us about the danger he poses as an adult. Even if adult drug traffickers may be categorically presumed to be dangerous, can juveniles adjudicated delinquent for their complicity to trafficking be presumed dangerous as adults? The State urges that the Ohio Supreme Court has already answered this question by approving the use of delinquency adjudications as a basis for a disability in *State v. Carnes*, 2018-Ohio-3256. In *Carnes*, the court held that R.C. 2923.13(A) embodies "a policy decision made by the legislature that allowing weapons in the hands of individuals with certain prior juvenile adjudications poses an increased risk to public safety, as does allowing weapons in the hands of those with other disabling conditions such as chronic alcoholism or drug dependence." *Carnes* at ¶ 16 (discussing R.C. 2923.13(A)(2)).

**{¶86}** But *Carnes* involved not R.C. 2923.13(A)(3), the drug-felony provision at issue in this case, but (A)(2), which covers juveniles adjudicated delinquent for *violent* felony conduct. This violent-felony disability offers a far stronger and more direct justification for deeming someone "dangerous" than in the case of drug felonies. Violent conduct inherently shows a willingness to do harm to others, while drug trafficking, at most, shows a recklessness in that regard. Further, *Carnes* reached its

conclusion after "emphasiz[ing] that," in the procedural-due-process context, "it is not our role to second-guess the General Assembly's policy choices." *Carnes* at ¶ 18. But, as we have discussed at length, the United States Supreme Court has said the Second Amendment requires just that sort of judicial second-guessing: "The enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. While such "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." *Bruen*, 597 U.S. at 26.

{¶87} The Eighth District's decision in *State v. King* is distinguishable for similar reasons. Although the Eighth District upheld a juvenile-delinquency disability under *Bruen*, it likewise addressed a juvenile adjudication for a violent felony under (A)(2), rather than the more ambiguous drug-felony disability imposed by (A)(3). *King*, 2024-Ohio-4585, at ¶ 18 (8th Dist.). *King* also confronted a *facial* rather than an as-applied challenge, which would have held (A)(2) unconstitutional for all juvenile adjudications—even with respect to a 17-year-old who willfully used a firearm to harm or attempt to harm another. *See id.* at ¶ 18-19. Our determination, by contrast, need only address drug-trafficking adjudications. And finally, *King* rejected any argument regarding juvenile status as not relating to "the history and tradition of firearms regulation" in our country. *Id.* at ¶ 32. But, surely, the "rehabilitative nature of juvenile offenses," *id.*, necessarily relates to the reasonableness of a determination that juvenile offenders are presumptively dangerous—and thus to whether such a disarming statute fits within our history and tradition of disarming dangerous individuals.

{¶88} Whether a juvenile delinquency adjudication for complicity to marijuana trafficking may serve as a basis for disarming an adult poses a complex question, and one that is a proper subject of judicial scrutiny under *Bruen*.

Fortunately, we need not resolve it in this case. As we will explain below, even if Thacker could have been presumed dangerous for some period following his delinquency determination, that period may not be presumptively indefinite.

### 2. Duration of Disarmament

{¶89} Even assuming that Thacker could be presumed dangerous and disarmed following his juvenile delinquency adjudication, the duration of that disarmament must be tailored to the duration of the danger he is alleged to pose. Disarmament of dangerous individuals at the founding was generally not permanent. As the Court noted in *Rahimi*, the bond requirement imposed by suretyship laws expired after a fixed period—effectively a period of presumptive, continued dangerousness—subject to further determinations by the justices of the peace. *Rahimi*, 144 S.Ct. at 1900. The going-armed laws did not disarm after the convicted person was discharged from jail. *See* 4 Blackstone, *Commentaries*, at *149 (listing the punishments for "going armed with dangerous or unusual weapons" as "forfeiture" of the weapons carried and "imprisonment during the king's pleasure," but not disarmament). And even the broad, categorical determinations to disarm loyalists, Catholics, or Native Americans could frequently be lifted, if the disarmed individuals showed themselves to be loyal by swearing an oath. *See Williams*, 113 F.4th at 657.

{¶90} Each of these laws can be viewed as introducing a legal *presumption* of dangerousness. In the suretyship laws, that presumption was based upon a finding of actual danger at the time of the initial determination, coupled with a presumption that the danger would continue for some period thereafter. This presumption was not permanent, however, as the danger was presumed to lapse at some point absent a showing to the contrary. And when states passed laws disarming broad groups feared dangerous to the state, they effectively created an initial presumption that those within

the group posed a danger. The states then allowed individuals within the group to rebut that presumption in an individualized manner—either because they had never posed a danger, or because they had ceased to pose one. *Williams* at 657 ("[S]everal historical examples authorized the official doing the disarming, usually the local justice of the peace, to make the dangerousness determination. Often, he was guided by some benchmarks, either a loyalty oath, the attestations of others, or some other statutory criteria."). The rule, so far as one can be devised, was that a disarmament based upon a presumptively temporary danger had to lapse of its own force, while a disarmament based on characteristics or risks presumed to be permanent could continue in perpetuity, subject to an individualized showing that the danger no longer existed.

{¶91} The *Williams* court applied this rationale to uphold 922(g)(1) as imposing a lifelong *presumption* that individuals convicted of crimes punishable by at least one year in prison were dangerous, subject to administrative relief and as-applied Second Amendment challenges. *Williams* at 662-663. The *Williams* court reasoned that felony crimes at the founding—at least those against the person—were considered a marker of one's permanent character. *Id.* at 658. "Rehabilitation" was not a primary focus of the 18th century criminal law, which allowed most crimes against the person to be punished with death on the rationale that such criminals could never safely become part of society. *Id.*, citing Banner, *The Death Penalty*, at 13 and 15.

{¶92} It remains unclear why this court should accept founding-era penological theory, except to the extent that theory was applied to or through disarming regulations rather than through capital punishment. But even if we did accept the anti-rehabilitative assumptions those in 1791 had regarding convicted felons, they would not control here. Thacker's disability was based on an Ohio juvenile

delinquency adjudication. Such a proceeding was unknown to the common law of 1791, and Ohio law expressly disavows any presumption that a juvenile delinquent cannot be rehabilitated.

{¶93} Rather, Ohio's juvenile justice system is predicated on the belief that juveniles can and generally *will* reform. Our General Assembly has declared that the "overriding purposes" of juvenile adjudications "are to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." R.C. 2152.01(A). This emphasis on "care," "development," "restor[ation]," and "rehabilitat[ion]" contrasts sharply with the dim view our founders had of the prospects of those convicted of dangerous felonies. Indeed, it contrasts with the "overriding purposes of felony sentencing" in Ohio today, which include "punish[ing] the offender," and "protect[ing] the public from future crime by the offender and others." R.C. 2929.11(A); *see also Hand*, 2016-Ohio-5504, at ¶ 14.

{¶94} Ohio law presumes that, when it comes to juveniles, rehabilitation and restoration will be the norm, not the secondary objective. Our juvenile-justice system was "designed to advance rehabilitation over punishment and to shield juveniles from the stigma of their juvenile delinquency." *In re D.R.*, 2022-Ohio-4493, ¶ 31. And the Ohio Supreme Court's holdings in *Carnes* and *Buttery* do not undermine this principle. Those cases emphasized that they addressed only the narrow questions of whether the Due Process Clause prohibited using a delinquency adjudication as the basis for a weapons disability or sex-offender-registration requirement. *Carnes*, 2018-Ohio-3256, at ¶ 4; *Buttery*, 2020-Ohio-2998, at ¶ 1, 32. They did *not* consider the substantive dimensions of those characterizations or the duration of the

presumption they imposed, because the court viewed such considerations as for the legislature alone. *Carnes* at ¶ 18; *Buttery* at ¶ 32. And, most obviously, neither opinion addressed the Second Amendment or considered the analogic relevance of the rehabilitative presumption under *Bruen*'s history-and-tradition analysis. *See Carnes* at ¶ 20 (declining to reach Second Amendment issue).

{¶95} Because this is an as-applied challenge, we do not decide that a juvenile delinquency adjudication may *never* be probative of whether an individual poses a danger to the community. But what we do hold is that the Second Amendment prohibits Ohio's General Assembly from imposing a lifelong presumption of dangerousness upon an individual based solely upon a juvenile delinquency adjudication for conduct that is not inherently violent, in order to restrict his ability to engage in otherwise-protected Second Amendment conduct. As written and as applied to Thacker, R.C. 2923.13(A)(3) imposes just such a lifetime presumption. And it imposes that lifetime presumption *in spite* of a system of juvenile justice predicated upon the assumption that those it adjudicates delinquent will be rehabilitated.

{¶96} Even if the State could impose a disability upon Thacker for some time following his juvenile drug adjudication, it may not do so for life. The State has offered no examples of a presumptively permanent disarmament law at the founding that applied to individuals whom the state expressly presumed would *cease* to be dangerous. Rather, the examples the State offers in its brief disarmed those the State had no reason to believe would cease to be dangerous in the future. Catholics were presumed to remain Catholic, and Loyalists would presumably still be loyal to their mother country. These attachments *could* change, but the state did not *presume* that they would. It thus fell to the disarmed individual to show the status quo had shifted.

{¶97} The State seeks to avoid the permanence of R.C. 2923.13's disarmament by pointing out that an individual may request that a court remove their disability under R.C. 2923.14. That statute permits individuals to regain their rights by demonstrating to the court of common pleas that they have completed their sentences and have "led a law-abiding life since discharge or release, and appear[] likely to continue to do so." R.C. 2923.14(D)(1)(a) and (D)(2). This, the State contends, renders Thacker's disarmament temporary—to be lifted as soon as the defendant proves himself sufficiently law-abiding. The Eighth District expressed a similar sentiment in *King*, 2024-Ohio-4585, at ¶ 32 (8th Dist.) ("R.C. 2923.13(A)(2) even fits squarely within the 'temporary' holding of the *Rahimi* Court because R.C. 2923.13(A)(2) allows an individual to apply for relief from [his disability] pursuant to R.C. 2923.14.").

{¶98} We agree that a legislative procedure for removing disabilities, including one that would require Thacker to petition a court of common pleas, *could* render his disability under R.C. 2923.13(A) temporary. Perhaps Thacker could even bear the burden of proof under such a statute. *See*, *e.g.*, *Williams*, 113 F.4th at 662 (placing burden on defendant to show nondangerousness). However, for such a scheme to work, it would need to apply objective, not subjective standards for determining whether the disability should be removed. *Compare Bruen*, 597 U.S. at 38, fn. 9 (discussing the need for objective standards in permitting regimes). The state of Washington, for example, allows individuals adjudicated delinquent of most felonies to petition a court to restore their firearm rights after being in the community for five years without a subsequent disarming offense. Wash.Rev.Code 9.41.041(2)(a)(i); Wash.Rev.Code 9.41.010(6) (defining "conviction" to include a juvenile adjudication); *see infra* Appendix, List A. While we express no opinion on the duration and contours of Washington's firearm-disability law, we note that such a

caveated, as-of-right framework would render the disability truly "temporary," even though a failure to apply for restoration could mean that the disability remained permanent.

**{¶99}** Ohio, however, offers *no* certainty as to when a disability must end. The only guidance R.C. 2923.14(D)(1)(a) offers courts is to ask whether the disarmed individual has "led a law-abiding life since discharge or release, and appears likely to continue to do so." For how long? It depends. By what metric? It depends. On what evidence? It depends. The answers to all these questions are "vested within a trial court's broad discretion," and are reviewed only for an abuse of that discretion. *In re Chrosniak*, 2017-Ohio-7408, ¶ 14 (8th Dist.). And the trial court's discretion is not even limited to the text of the statute—"the plain language of R.C. 2923.14(D) specifies that *even if all the factors are established to the trial court's satisfaction*, it is nevertheless within the court's discretion whether to grant the application." (Emphasis added.) *State v. Lerch*, 2016-Ohio-2791, ¶ 24 (4th Dist.). Thus, courts have blessed the use of unpredictable, nonstatutory considerations within the trial court's discretionary exercise. *See, e.g.*, *Chrosniak* at ¶ 23-24 (approving trial court's denial of relief based on violent character of underlying conviction, despite conceding that defendant had "led a law abiding life since the time of his discharge [26 years prior] and appear[ed] likely to continue to do so"); *Lerch* at ¶ 24-25 (rejecting appeal from a denial of relief, even though applicant sought "relief from prior convictions for the nonviolent, non-drug offenses of passing bad checks"); *see also In re Relief from Disability of Mercer*, 2001-Ohio-4078, 2001 Ohio App. LEXIS 4814, at *7 (10th Dist. Oct. 30, 2001) (refusing to establish a "bright-line test for determining release from disability cases" because doing so "would ignore the discretion the trial court is specifically granted in R.C. 2923.14").

{¶100}Relief from a disability in Ohio amounts to an act of grace by the trial court, not a restoration as of right. The same argument that holds out R.C. 2923.14(D) as rendering Thacker's disability "temporary," would apply nearly as well to an executive pardon. And while the discretion a trial court wields is more limited than the governor's pardon pen, that limitation cuts against the Second Amendment right, for the governor may pardon even those who have not led a "law-abiding life." *See* Ohio Const., art. III, § 11 (granting governor power to "grant . . . pardons, for all crimes and offenses, except treason and cases of impeachment, upon such conditions as the governor may think proper"); *State v. Boykin*, 2013-Ohio-4582, ¶ 19 ("the legislature may not prescribe substantive regulations concerning the governor's discretion in granting a pardon").

{¶101} Further, R.C. 2923.14(F)(3) permits the court that removed a petitioner's disability to "revoke[]" that relief "at any time for good cause shown and upon notice to the applicant." This "good cause" standard is no less discretionary than the "proper cause" licensure requirement rejected in *Bruen*. *See Bruen*, 597 U.S. at 12-14; *id.* at 79-80 (Kavanaugh, J., concurring). And under R.C. 2923.14, a petitioner's Second Amendment rights are not only subject to the trial court's discretion in resolving the initial petition, but remain so in perpetuity. *See Skaggs*, 2024-Ohio-4781, at ¶ 70 (5th Dist.) (King, J., dissenting).

{¶102}Perhaps such a discretionary regime for restoring Second Amendment rights would be appropriate for individuals who can be presumed dangerous for life. Perhaps, as suggested by the *Williams* court, the presumption attached to those convicted of felony crimes against the person would be so strong that restoration of their rights could hinge on an act of grace. We express no opinion on such questions. But, as we have said, Ohio law presently and historically has attached a presumption

of rehabilitation to juvenile delinquency determinations. Thus, Ohio may not attach an indefinite presumption that those adjudicated to be nonviolent delinquent juveniles will forever be dangerous. Any presumption of danger for such persons must end, either of its own force or as of right upon application.

{¶103} We note further that Ohio's "unusual discretionary . . . regime" for restoring the rights of individuals like Thacker is an "outlier" among its sister states. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring) ("New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense."). Of all 50 states (and the District of Columbia), only *five* other jurisdictions presumptively deny an individual's right to bear arms permanently based on a juvenile drug adjudication. *See infra* Appendix, List A. By contrast, 18 jurisdictions temporarily disarm individuals adjudicated delinquent for drug felonies for some limited period of time—either between two and ten years from the end of any sentence, or until the individual reaches a statutory age between 24 and 30. *See infra* Appendix, List B. The remaining 26 states, plus the District of Columbia, impose no apparent weapons disability based on juvenile delinquency adjudications for drug offenses. *See infra* Appendix, List C. Federal law, which likewise prohibits numerous groups from possessing firearms, does not disarm based on juvenile delinquency adjudications. *See* 18 U.S.C. 922(g).

{¶104} While the "outlier" character of Ohio's law in this area does not, itself, render it unconstitutional, the fact that most other states do not disarm individuals like Thacker *does* demonstrate widespread recognition of the basic underpinnings of this decision: that the permanent disarmament of those adjudicated delinquent as juveniles for drug offenses is inconsistent with the Second Amendment and the

principles of juvenile justice. Nearly 90 percent of states, including states as politically and geographically diverse as Texas, Tennessee, California, Hawaii, and Delaware—as well as D.C. and the federal government—have legislated accordingly. Not only does Ohio's attempt to criminalize Thacker's possession of a firearm defy history and tradition, it also bucks the general consensus among modern legislatures.

{¶105} We therefore hold that R.C. 2923.13(A)(3) is unconstitutional as applied to an individual who, like Thacker, was (1) adjudicated delinquent as a minor (2) for nonviolent conduct, thus (3) disarming him, presumptively for life, (4) subject only to a trial court's discretionary determination whether to lift his disability.

## V. THE OHIO CONSTITUTION

{¶106} Because we hold that the federal constitution prevents the State's criminal prosecution of Thacker under R.C. 2923.13(A)(3), we need not address Thacker's alternative argument, which he made before the trial court, that his prosecution runs afoul of Article I, Section 4 of the Ohio Constitution. We note only that, to the extent the Ohio Supreme Court has suggested Ohio's right to bear arms extends beyond the Second Amendment to the United States Constitution, such pronouncements came before the shift in Second Amendment jurisprudence heralded by *Heller*. *See Arnold v. City of Cleveland*, 67 Ohio St.3d 35, 46 (1993); *see also King*, 2024-Ohio-4585, at ¶ 37 (8th Dist.); *Windland*, 2024-Ohio-1760, at ¶ 24 (5th Dist.). *But see Skaggs*, 2024-Ohio-4781, at ¶ 73-90 (5th Dist.) (King, J., dissenting) ("the text, history, and tradition of our own constitution may serve as an independent basis to strike down the restriction").

{¶107} The court below engaged in no substantive legal analysis regarding the scope of Article I, Section 4, of the Ohio Constitution and ruled solely on the *Bruen* issue. Thacker likewise offers no independent Ohio Constitutional argument in his

brief. We therefore decline to opine on the breadth of Ohio's independent protection of the right to bear arms in this case.

## VI. CONCLUSION

{¶108}The State has not provided evidence of a compelling, relevantly similar tradition of imposing presumptively permanent disarmament upon persons who have been found to have engaged in unlawful, nonviolent conduct but who are presumed to have reformed. Even assuming that felons may be categorically disarmed, juvenile adjudications under Ohio law could not fall within that tradition because they do not include the crucial safeguard of the jury trial. And, while the State may disarm categories of persons deemed dangerous, those categories must be reasonably limited to dangerous persons, and the duration of disarmament reasonably tailored to the period in which the disarmed party poses a danger. Even assuming Thacker's juvenile delinquency adjudication for complicity to trafficking in marijuana could support an adequate inference of dangerousness, history, tradition, and Ohio law suggest that such a disability cannot last forever. We therefore overrule the State's sole assignment of error and affirm the trial court's judgment dismissing counts eight and nine of Thacker's indictment.

Judgment affirmed.

**BOCK, P.J.**, concurs.
**WINKLER, J.**, dissents.


**WINKLER, J.**, dissenting.

{¶109}The trial court erred in granting Thacker's motion to dismiss the weapons-under-a-disability charges under R.C. 2923.13(A)(3). The trial court's decision granting the motion to dismiss is premised upon the flawed reasoning of *State*

*v. Booker*, Hamilton C.P. No. B-2302415 (Dec. 19, 2023). Therefore, I respectfully dissent.

**{¶110}** Generally, we review a trial court's decision on a motion to dismiss de novo. *State v. Thompson*, 2013-Ohio-2647, ¶ 4 (1st Dist.); *State v. Battease*, 2006-Ohio-6617, ¶ 14 (1st Dist.). Legislative enactments enjoy a strong presumption of constitutionality. To overcome that presumption, the challenging party must prove that the statute is unconstitutional beyond a reasonable doubt. *Klein v. Leis*, 2003-Ohio-4779, ¶ 4; *State v. Campbell*, 2013-Ohio-5612, ¶ 3 (1st Dist.). "Further, 'doubts regarding the validity of a legislative enactment are to be resolved in favor of the statute.'" *State v. Grievous*, 2022-Ohio-4361, ¶ 9, quoting *State v. Gill*, 63 Ohio St.3d 53, 55 (1992).

**{¶111}** Thacker contends that R.C. 2923.13(A)(3) is unconstitutional as applied to him. The party contending that a statute is unconstitutional as applied bears the burden to present clear and convincing evidence that makes the statute void when applied to the facts of the case. *Harrold v. Collier*, 2005-Ohio-5334, ¶ 38; *Campbell* at ¶ 16.

**{¶112}** R.C. 2923.13(A) provides in pertinent part, "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person . . . has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."

**{¶113}** R.C. 2923.14 provides a mechanism for an individual to obtain relief from a disability. He must first file an application in the court of common pleas in the county in which he lives. R.C. 2923.14(A) and (B). Pertinent to this case, after a

hearing, a court may grant the application for relief if (1) the application is based on an indictment, a conviction, or an  adjudication, the applicant has been fully discharged from imprisonment, community control, postrelease control, and parole; (2) the applicant has led a law-abiding life since discharge or release, and appears likely to continue to do so; and (3) the applicant is not otherwise prohibited by law from acquiring, having, or using firearms.  R.C. 2923.14(D).

{¶114} Under this statute, an applicant is entitled to make an individualized showing of his or her qualification to bear arms.  Therefore, a ban on possession of a firearm is not necessarily a lifetime ban.  *State v. Skaggs*, 2024-Ohio-4781, ¶ 25 (5th Dist.); *State v. Windland*, 2024-Ohio-1760, ¶ 21, fn. 1 (5th Dist.).  Additionally, in 2015, the legislature amended R.C. 2923.13(A) to change the phrase "Unless relieved from disability as provided in section 2923.14 of the Revised Code . . ." to "Unless relieved from disability under operation of law or legal process . . . ."  *State v. TJD*, 2020-Ohio-3745, ¶ 21 (2d Dist.).  The use of that language expanded the way that an individual could be relieved of a disability.  For example, sealing of a record of conviction under R.C. 2953.32 is "an operation of law or legal process" that relieves a disability imposed under R.C. 2923.13(A)(3).  *Id.* at ¶ 33-35.

{¶115} Thacker did not apply to be relieved of his disability under R.C. 2923.14 or any other "operation of law or legal process."  The decision whether to grant an application or relief from a disability lies within the trial court's discretion.  *In re Allender*, 2018-Ohio-2147, ¶ 13 (11th Dist.); *In re Chrosniak*, 2017-Ohio-7408, ¶ 14 (8th Dist.).  Nevertheless, Thacker never requested that a court exercise its discretion.  Prior to his indictment on the current charges, the facts demonstrate that he met the criteria set forth in R.C. 2923.14, and a trial court in its discretion may have granted

an application for relief from the disability. We will never know, since he never applied for relief from the disability.

{¶116} In rejecting an as-applied challenge to a federal statute similar to R.C. 2923.13, the Sixth Circuit Court of Appeals stated, "History shows that governments may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't." *United States v. Williams*, 113 F.4th 637, 661-662 (6th Cir. 2024). Thacker had that opportunity under R.C. 2923.14, but he did not avail himself of the statutory remedies available to him. *See State v. Carnes*, 2018-Ohio-3256, ¶ 12. In my view, that failure prevents him from claiming that R.C. 2923.13(A)(3) is unconstitutional as applied to him and the particular facts of this case. For the first time, Thacker raised his claim that the statute was unconstitutional as applied to him after he was indicted not only on two weapons-under-disability counts, but also five counts of felonious assault. He was ultimately convicted of two felonious-assault counts with firearm specifications.

{¶117} Had Thacker applied for relief from his disability and that application had been denied, I do not find merit in his contention that his rights under the Second Amendment would have been violated. In *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment to the United States Constitution confers an individual right to keep and bear arms. *Id.* at 595. Therefore, the Court found a District of Columbia law prohibiting the ownership and possession of handguns inside the home and used for self-defense to be unconstitutional. *Id.* at 635-636.

{¶118} In *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that the right to bear arms enshrined in the Second Amendment "is fully applicable to the states." *Id.* at 750 and 791. Thus, the Court struck down similar laws in Chicago and

Oak Park that banned the possession of handguns in the home. *See Campbell*, 2013-Ohio-5612, at ¶ 6 (1st Dist.).

{¶119} Nevertheless, in *Heller*, the Supreme Court pointed out that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller* at 626. It stated,

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626-627. The Court continued, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id*. at 627, fn. 26.

{¶120} Subsequently, In *N.Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022), the Court extended the individual right to own a handgun for self-defense to outside the home. It held that a New York law that issued public-carry licenses only when an applicant demonstrated a special need for self-defense violated the Second Amendment. *Id*. at 8-10. In doing so, it clarified the test to be applied in determining if a law violates the Second Amendment.

{¶121} The Court in *Bruen* noted that after *Heller*, appellate courts "have coalesced around a 'two-step framework' for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id*. at 17. It examined the two-step

approach and declined to apply it, noting that it is "one step too many." *Id.* at 19. It stated,

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17.

{¶122} The Court in *Bruen* also stated that while the test regarding the constitutionality of firearm regulations has removed the means-end framework, the analysis for those questions remains much the same as it was in *Heller*. As with *Heller*, a court must begin with a "textual analysis" focused on the "normal and ordinary meaning" of the Second Amendment and examine the history of "analogous arms-bearing rights in state constitutions that preceded and immediately followed the adoption of the Second Amendment" and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Bruen*, 597 U.S. at 20.

{¶123} Further, the concurring opinions in *Bruen* noted that it "does not 'disturb anything . . . in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns.'" *State v. Jackson*, 2023-Ohio-2063, ¶ 9 (8th Dist.), quoting *In re Terry*, 2022 U.S. App. LEXIS 31448, *4 (11th Cir. Nov. 14, 2022).

*Heller* recognized that the right to bear arms "was not a right to keep and carry any weapon whatsoever in any manner and for whatever purpose." *Heller*, 554 U.S. at 626.

**{¶124}** In June 2024, the United States Supreme Court clarified its holding in *Bruen*. In *United States v. Rahimi*, ___ U.S. ___, 144 S.Ct. 1889 (2024), it held that "[a]n individual found by a court to post a credible threat to the physical safety of another may be temporarily disarmed consistent the Second Amendment." *Id*. at 1903. It stated that prohibitions on the possession of firearms by felons and the mentally ill are "presumably lawful." *Id*. at 1902, citing *Heller*, 554 U.S. at 626-627. Thus, *Rahimi* "reaffirmed the notion that the Supreme Court's previous case in *Heller* was not undermined by *Bruen*, and that when the prohibition relates to a convicted felon or someone who is otherwise a danger to others, the Second Amendment is not a bar to disarming such a person." *Skaggs*, 2024-Ohio-4781, at ¶ 14 (5th Dist.).

**{¶125}** Under *Heller*, several Ohio appellate districts have held that R.C. 2923.13(A)(3) is constitutional. *See State v. Morris*, 2009-Ohio-6033, ¶ 85 (11th Dist.). Further, numerous federal courts have upheld federal prohibitions on possession of weapons by felons or persons using controlled substances as constitutional under *Bruen*. *See Skaggs* at ¶ 20-23. The purpose of R.C. 2923.13 is "to prohibit the possession of any firearm or dangerous ordnance by persons who are reasonably classified as bad risks, including those indicted or convicted of drug offenses. A rational connection exists between the inherent danger of firearms and the antisocial behavior of those who have a record of violating the law." *Morris* at ¶ 86.

**{¶126}** R.C. 2923.13 does not broadly restrict the use of firearms by the public generally. It only restricts the use by a specifically defined category of people. It is similar to two separate historical traditions, (1) the historical tradition of restricting

the right of habitual drug users, alcoholics, or the mentally ill to possess or carry firearms, and (2) the historical tradition of disarming those the legislature deems dangerous. *Skaggs* at ¶ 16.

{¶127} This analysis does not change simply because it is applied to a juvenile adjudication. Courts reviewing the historical tradition of firearm regulations have held that the founders would have supported limiting or banning the ownership of firearms by minors, much like banning ownership by felons or the mentally ill. *See NRA of Am. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012); *United States v. Rene E.*, 583 F.3d 8, 23 (1st Cir. 2009); *Powell v. Thompkins*, 926 F.Supp.2d 367, 387 (D.Mass. 2013). "[C]ertain access-limiting conditions were and may be lawfully imposed upon individuals seeking to own and use firearms. Age-based restrictions, enacted for reasons of public safety, are among those lawful impositions." *Powell* at 387.

{¶128} The majority opinion discusses how juvenile court decisions are civil and treated differently than adult cases. The Ohio Supreme Court has recognized that at their inception "juvenile courts were premised on profoundly different assumptions and goals than a criminal court." *In re C.S.*, 2007-Ohio-4919, ¶ 66. Nevertheless, the Court recognized the inherent tension in the juvenile court system between the goals of juvenile rehabilitation and protection of society. *Id.* at ¶ 75. "[A]lthough we often characterize juvenile proceedings as civil rather than criminal, . . . we recognize that '[w]hatever their label, juvenile delinquency laws feature inherently criminal aspects that we cannot ignore.'" *Id.* at ¶ 76, quoting *State v. Walls*, 2002-Ohio-5059, ¶ 26.

{¶129} The Ohio Supreme Court and this court have held that a prior juvenile adjudication may be an element of the weapons-under-disability offense without violating due process under the Ohio or United States Constitutions. *Carnes*,

2018-Ohio-3256, at ¶ 21; *State v. McCray*, 2017-Ohio-2996, ¶ 21 (1st Dist.). In *Carnes*, the defendant was charged with a violation of R.C. 2923.13(A)(2), in which the disability is that "[t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." It stated that a juvenile adjudication is not a sentence enhancement but is actually an element of the offense. *Carnes* at ¶ 10. "R.C. 2923.13, the weapons-under-disability statute did not equate a juvenile adjudication with an adult conviction but instead considered a juvenile adjudication itself as one of several discrete conditions that prevented a person from legally possessing a firearm." *State v. Buttery*, 2020-Ohio-2998, ¶ 16.

{¶130} Inherent in R.C. 2923.12(A)(2), is a "policy decision made by the legislature that allowing weapons in the hands of individuals with certain prior juvenile adjudications poses an increased risk to public safety, as does allowing weapons in the hands of those with other disabling conditions such as chronic alcoholism or drug dependence." *Carnes* at ¶ 16.

{¶131} The Court noted that the risk-assessment made by the legislature did not undermine the rehabilitative purpose of the juvenile system. *Id.* at ¶ 17. "[T]he lack of a right to a jury trial, as well as other protections, does not make prior juvenile adjudications unreliable for risk-assessment purposes." *Id.* In reaching this conclusion, the Court recognized that a legal disability "can arise from far less than a jury-eligible criminal conviction," such as when a person is under indictment for certain felonies, fugitives, persons deemed to be mentally incompetent, and persons with chronic drug dependence, a danger of drug dependence, or chronic alcoholism. *Id.* at ¶ 11.

{¶132} The same logic applies to R.C. 2923.13(A)(3) when the disability is a juvenile adjudication for the commission of acts that would constitute a felony drug offense if committed by an adult. The link between drug offenses and violence is well known. *See State v. Thompson*, 2006-Ohio-4285, ¶ 11 (1st Dist.). "[D]rug trafficking is a serious offense that, in itself, poses a danger to the community." *Williams*, 113 F.4th at 659, quoting *United States v. Stone*, 608 F.3d 939, 947, fn. 6 (6th Cir. 2010). This court has stated that one of the purposes of R.C. 2923.12(A)(3) is "to keep weapons out of the hands of persons involved with drugs." *State v. Stone*, 2011-Ohio-3617, ¶ 21 (1st Dist.), quoting *State v. Gex*, 2011-Ohio-631, ¶ 22 (2d Dist.). "The nature of narcotics trafficking today reasonably warrants the conclusion that a suspected dealer may be armed and dangerous." *State v. McQuitty*, 2005-Ohio-5905, ¶ 12 (12th Dist.), quoting *State v. Jordan*, 2004-Ohio-6085, ¶ 61.

{¶133} In *State v. Johnson*, 2019-Ohio-5386 (3d Dist.), a pre-*Bruen* case that relied on *Heller* and *McDonald*, the defendant was charged with having weapons under a disability under R.C. 2923.13(A)(2) because of a previous juvenile adjudication for burglary, an offense of violence. The defendant filed a motion to dismiss, in which he challenged the constitutionality of the statute, raising both facial and as-applied arguments under the Second Amendment. The trial court denied the motion.

{¶134} On appeal, the appellate court stated that both the United States Supreme Court and the Ohio Supreme Court have held that the Second-Amendment right is not unlimited and subject to reasonable regulation. It recognized that in *Carnes*, the Ohio Supreme Court stated that there was a legislative purpose in keeping firearms away from people who the legislature classified as potentially irresponsible

and dangerous, and a juvenile adjudication could be a valid risk-assessment tool. *Johnson* at ¶ 30-32.

{¶135} The appellate court further noted that after *Heller*, other courts around the country had addressed similar issues and upheld restrictions on the right to bear arms based on juvenile adjudications. *Id*. at ¶ 34. It held that although a juvenile adjudication is not a criminal conviction, the legislature was wholly within its powers to use that adjudication for an offense that would be a felony offense of violence if committed by an adult as a "risk assessment tool." *Id*. at ¶ 35.

{¶136} Subsequently, in *State v. King*, 2024-Ohio-4585 (8th Dist.), decided after *Bruen* and *Rahimi*, the defendant was indicted for having weapons under a disability under R.C. 2923.13(A)(2). The disability was a juvenile adjudication which would have been felony domestic violence if committed by an adult. The defendant filed a motion to dismiss the indictment, raising both facial and as-applied challenges, which the trial court overruled. He later filed a no-contest plea and was convicted of the charged offense.

{¶137} The appellate court affirmed the conviction. On appeal, the defendant abandoned his as-applied challenge. As to the facial challenge, the court recognized that R.C. 2923.13(A)(2) "serves to disarm those who have committed violent, felony offenses, regardless of the offender's age at the time of the felonious, violent offenses." *Id*. at ¶ 22. It also discussed *Bruen* and *Rahimi* and held that the restrictions under R.C. 2923.13(A)(2) comport with "this Nation's historical tradition of firearm regulation" as stated in *Rahimi*. It discussed the federal statute that *Rahimi* had upheld. "In *Rahimi*, the U.S. Supreme Court unequivocally specified that it is not a violation of the Second Amendment to disarm an 'individual' (which is not limited to an adult), who has been 'found by a court' (which is not limited to an adult court) to

'pose a credible threat to the physical safety of another' (without specifying that this may be determined only by a conviction versus a juvenile adjudication)." *King* at ¶ 28, citing *Rahimi*, , 144 S.Ct. at 1903.

{¶138} The court in *King* also relied on language in *Bruen*, which cited to a decree from 1866 in South Carolina, which stated that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." *King* at ¶ 29, quoting *Bruen*, 597 U.S. at 63. It observed that in the next sentence, *Bruen* discussed newspaper editors who borrowed language from a Freedmen's Bureau circular "who maintained that 'any person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons[.]'" *Id.* at ¶ 29, citing *Bruen* at 63. It added, "Notably, these are not limited to *adults* and it is undisputed that juveniles may pose a threat to the safety of another." (Emphasis in original.) *Id.*

{¶139} In *King*, the defendant had argued that a juvenile adjudication should be viewed as separate and distinct from an adult conviction, and that it should not constitute a disabling offense for the purpose of the having-weapons-under-disability statute. He cited to the goals of juvenile courts, as well as the fact that juvenile cases are not tried before juries. *King*, 2024-Ohio-4585, at ¶ 30 (8th Dist.).

{¶140} The court stated that those arguments mirrored those in the dissenting opinion in *Carnes*, which relied on scientific research that a juvenile's brain is underdeveloped, along with decisions of the United States Supreme Court holding juveniles are less culpable for their conduct and more likely to benefit from the rehabilitative efforts of the justice system. *Id.* at ¶ 31, citing *Carnes*, 2018-Ohio-3256, at ¶ 42 (O'Connor, C.J., dissenting). The *King* court rejected these arguments, finding that they go to the "culpability and rehabilitative nature of juvenile offenses; they do not specifically relate to the 'history and tradition of firearms regulation' and can

coexist with *Rahimi* . . . ." *Id.* at ¶ 32. Consequently, the *King* court determined that R.C. 2923.13(A)(2) did not violate the protections guaranteed by the Second Amendment. *Id.* at ¶ 27.

{¶141} I am in agreement with the reasoning of *Johnson* and *King*. Therefore, I would hold that R.C. 2023.13(A)(3) is not unconstitutional as applied to Thacker, and that his weapons-under-disability charges do not violate his right to bear arms under the Second Amendment.

{¶142} Thacker also contends that weapons-under-disability charges violate the Ohio Constitution. Courts have stated that because "the United States Constitution now equally protects the right of the individual to bear arms, we see no obvious conflict between the Ohio Constitution and the United States Constitution." *King*, 2024-Ohio-4585, at ¶ 35 (8th Dist.), quoting *Windland*, 2024-Ohio-1760, at ¶ 24 (5th Dist.). Therefore, I would hold that Thacker has not demonstrated that R.C. 2923.13(A)(3) is unconstitutional under the Ohio Constitution.

{¶143} In sum, I would sustain the State's assignment of error. I would reverse the trial court's judgment granting Thacker's motion to dismiss the weapons-under-disability charges on the basis that R.C. 2923.13(A)(3) is unconstitutional as applied to Thacker, and remand the cause to the trial court for further proceedings on those charges.

Please note:

The court has recorded its entry on the date of the release of this opinion.

**APPENDIX:**
**SURVEY OF STATE STATUTES DISARMING JUVENILE DRUG OFFENDERS**

### *List A:*
### *Permanent Disarmament for Juvenile Drug Adjudications*

The following states' statutes, like Ohio's R.C. 2923.13, impose presumptive lifetime disarmament for those adjudicated delinquent for felony drug offenses:

1. **Connecticut** law disarms any person adjudicated delinquent for a "serious juvenile offense," Conn.Gen.Stat. 53a-217(a)(2), which is defined to include any violation by a 16- or 17-year-old of "any federal or state law" subject to exceptions not relevant here. Conn.Gen.Stat. 46b-120(2)(A).

2. **Illinois** prohibits owning a firearm without a "Firearm Owner's Identification Card," 430 Ill.Comp.Stat. 65/2(a)(1), (2), but will not issue such a card to any "adult who had been adjudicated a delinquent minor . . . for the commission of an offense that if committed by an adult would be a felony." 430 Ill.Comp.Stat. 65/8(p).

3. **Iowa** prohibits a "person . . . who is adjudicated delinquent on the basis of conduct that would constitute a felony if committed by an adult" from possessing, receiving, or transporting a firearm. Iowa Code 724.26(1).

4. **Massachusetts** requires a license to possess a firearm, Mass.Gen.Laws, Ch. 140, Section 131(a) (effective Oct. 23, 2024), but only permits the issuance of licenses to individuals who have never "been convicted or adjudicated as a youthful offender or delinquent child . . . for the commission of" a felony offense or a controlled-substances offense. Mass.Gen.Laws, Ch. 140, Section 121F(j)(i) (effective Oct. 23, 2024).

5. **Wisconsin** law states that a "person who possesses a firearm is guilty of a Class G felony if . . . [t]he person has been adjudicated delinquent for an act . . . that if committed by an adult in this state would be a felony." Wis.Stat. 941.29(1m)(bm).

### *List B:*
### *Limited Disarmament for Juvenile Drug Adjudications*

The following states' statutes prohibit individuals adjudicated delinquent for felony drug conduct from possessing a firearm for a limited period:

1. **Alaska** law makes it a crime to "knowingly possess[] a firearm capable of being concealed on one's person after having been . . . adjudicated a delinquent minor for conduct that would constitute a felony if committed by an adult." Alaska Stat. 11.61.200(a)(1). However, that provision "do[es] not apply to a person if . . . a period of 10 years or more has elapsed between the date of the person's unconditional discharge on the prior . . . adjudication of juvenile delinquency and the date" on which they possessed the firearm. Alaska Stat. 11.61.200(b)(1)(C).

2. **Arizona** law prohibits persons who were "previously adjudicated delinquent for an offense that would be a felony if committed by an adult" from possessing a firearm. Ariz.Rev.Stat. 13-3113. Such individuals may apply and have their rights

restored two years after their sentence ends for most felonies, and at age 30 for "serious" or "dangerous" felonies. Ariz.Rev.Stat. 8-249(B) and (C).

3. **California** prohibits any person "adjudged a ward of the juvenile court" for numerous crimes, including certain drug felonies, from possessing or owning a firearm until they are at least 30 years of age. Cal.Penal Code 29820(a)(1), (a)(2), and (b).

4. **Delaware** prohibits any person from owning a deadly weapon "who, as a juvenile, has been adjudicated as delinquent for conduct which, if committed by an adult, would constitute a felony, until that person reaches the age of 25." Del.Code, Title 11, sec. 1448(a)(4).

5. **Florida** disarms persons "[f]ound . . . to have committed a delinquent act that would be a felony if committed by an adult and such person is under 24 years of age." Fla.Stat. 790.23(1)(b).

6. **Hawaii** law provides that "[n]o person who is less than twenty-five years old and has been adjudicated by the family court to have committed a felony, a crime of violence, a criminal offense relating to firearms, or an illegal sale or distribution of any drug shall own, possess, or control any firearm or ammunition." Haw.Rev.Stat. 134-7(d).

7. **Kansas** law prohibits an individual who "was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of" certain felony crimes—including controlled substances violations—from possessing a firearm for eight years from the date on which her sentence ended. Kan.Stat. 21-6304(a)(3)(A)(i)(b), (a)(3)(A)(ii), and (a)(3)(B).

8. **Kentucky** law sets forth two groups of juvenile offenders. The first type are the "public offenders," who are the subject of "public offense actions" brought "in the interest of a child" accused of committing a crime—much like juvenile delinquency adjudications in other states. Ky.Rev.Stat. 600.20(51). However, a juvenile may be deemed a "youthful offender" if they are at least 14 and are charged with a Class A or B felony, or if they are 16, have a prior public offense, and are charged with a Class C or D felony. *See* Ky.Rev.Stat. 635.020(1), (2), and (3); Ky.Rev.Stat. 640.010. Public-offense adjudications occur in the juvenile session of the district court, and Kentucky Law states shall not "be deemed a conviction, nor shall such adjudication operate to impose any of the civil disabilities ordinarily resulting from a criminal conviction, nor shall any child be found guilty or be deemed a criminal by reason of such adjudication." Ky.Rev.Stat. 635.040. Thus, public offenses cannot be used as a predicate felony for the crime of "possession of a firearm by a convicted felon." Ky.Rev.Stat. 527.040(1). However, this disarming provision *does* "apply to any youthful offender convicted of a felony offense." Ky.Rev.Stat. 527.040(3). But youthful offenders are subject to full criminal process, but with certain limitations on their potential sentence. Ky.Rev.Stat. 640.040. "Trafficking in controlled substance" may be a misdemeanor or a felony of any class, A through D, depending upon the nature and quantify of the drug being trafficked, as well as the trafficker's history of similar offenses. *See* Ky.Rev.Stat. 218A.1412, 218A.1413, and 218A.1414. Except for a second offense involving more than five pounds, marijuana trafficking does not rank above a Class C felony. Ky.Rev.Stat. 218A.1421(1) through (4).

9. **Louisiana** imposes a ten-year firearms ban after an individual completes their sentence or probation for certain "felony-grade delinquent act[s]" adjudicated while they were 15 or 16, including "any violation of the Uniform Controlled Substances Law," among other felonies. La.Rev.Stat. 14:95.1(A)(1), (A)(2)(a), and (C).

10. **Maine** prohibits individuals from owning a gun for three years if they were adjudicated delinquent for conduct amounting to a felony punishable by at least a year in prison, but which did not involve domestic violence, a firearm, or bodily injury. Me.Rev.Stat., Title 15, sec. 393(1-A).

11. **Maryland** prohibits individuals from owning firearms who are "under the age of 30 years at the time of possession" and who have "been adjudicated delinquent . . . for an act that would be a disqualifying crime if committed by an adult." Md.Code, Pub.Safety 5-205(b)(13) and 5-133(b)(15). "Disqualifying crime[s]" include all felonies. Md.Code, Pub.Safety 5-101(g)(2).

12. **Nebraska** prohibits individuals "under the age of twenty-five years" from owning guns if they have "previously been adjudicated an offender in juvenile court for an act which would constitute a felony." Neb.Rev.Stat. 28-1204.05(1). The disarmed individual may also petition to have the right reinstated prior to turning 25 under Neb.Rev.Stat. 28-1204.05(4).

13. **North Dakota** prohibits individuals "convicted . . . of a felony offense involving violence or intimidation" from possessing a gun for ten years following their convictions or sentences. N.D.Cent.Code 62.1-02-01(1)(a). It further disarms individuals convicted of any other felony offense for five years following their conviction or sentence. N.D.Cent.Code 62.1-02-01(1)(b); *State v. Moses*, 2022 ND 208, ¶ 4 (noting that "[a]ny felony conviction will serve as a predicate" for this provision). The statute defines "conviction" to include individuals "subject to juvenile adjudication or proceedings and a determination of a court . . . that the person committed the delinquent act or offense." N.D.Cent.Code 62.1-02-01(2)(f).

14. **Oklahoma** prohibits "any person previously adjudicated as a delinquent child or a youthful offender for the commission of an offense, which would have constituted a felony offense if committed by an adult," from possessing a firearm "within ten (10) years after such adjudication." 21 Okla.Stat. 1283(D).

15. **Oregon** statute defines the crime of "unlawful possession of a firearm" to include any person who knowingly possesses a firearm, was "found to be within the jurisdiction of the juvenile court for having committed an act which, if committed by an adult, would constitute a felony," and who was discharged from that jurisdiction "within four years prior to being charged with" unlawful possession. Or.Rev.Stat. 166.250(1)(c)(B). This would include drug felonies.

16. **Utah** makes it a second-degree felony for an individual to possess a firearm who, "within the last 10 years[,] has been adjudicated" by the juvenile court "for an offense which if committed by an adult would have been a violent felony." Utah Code 76-10-503(1)(a)(iv) and (2). And Utah makes it a third-degree felony for an individual to possess a firearm who, "within the last seven years[,] has been adjudicated delinquent for an offense which if committed by an adult would have been a felony" but not a violent felony. Utah Code 76-10-503(1)(b)(iii) and (3).

17. **Virginia** law makes it illegal for "any person under the age of 29 who was adjudicated delinquent as a juvenile 14 years of age or older at the time of the offense of a delinquent act which would be a felony if committed by an adult . . . to knowingly and intentionally possess or transport any firearm or ammunition for a firearm." Va.Code 18.2-308.2(A). However, if the delinquency adjudication was for murder, kidnaping, "robbery by the threat or presentation of firearms," or rape, then the prohibition on possession of firearms does not end at age 29, but continues indefinitely. *Id.*

18. **Washington** forbids individuals from possessing a firearm "after having previously been convicted" of a felony. Wash.Rev.Code 9.41.040(1)(a) and (2)(a)(i)(A). In this context, "convicted" is defined to include those who plead or are found guilty in an adult criminal proceeding, as well as those "adjudicated in a juvenile court." Wash.Rev.Code 9.41.010(6). However, Washington permits individuals "convicted" of a felony offense to petition a court to restore their firearm rights if they have "been in the community without being convicted or found not guilty by reason of insanity of any crime that prohibits the possession of a firearm" for five years, Wash.Rev.Code 9.41.041(2)(a)(i), unless the prior conviction was for a "felony sex offense[,] a class A felony[,] or a felony offense with a maximum sentence of 20 years." Wash.Rev.Code 9.41.041(1). The manufacture, delivery, and possession with intent to distribute of narcotics, amphetamines or similar substances are classified as Class B felonies, while other drug felonies are generally Class C, at most. *See* Wash.Rev.Code 69.50.401(2) and 69.50.410(1). It does not appear that a drug offense can constitute a "class A felony," or come with a maximum sentence of 20+ years. Because drug felonies do not fall within any exception, a person adjudicated delinquent for a drug felony in Washington may petition a court and have their right to possess a firearm restored as of right after five years of good behavior.

### *List C*
### *No Disarmament for Juvenile Drug Adjudications*

The following states do not prohibit firearms possession by those adjudicated delinquent for drug crimes.

1. **Alabama**'s felony-disarmament statute is limited to those convicted in criminal proceedings and does not appear to apply to individuals adjudicated delinquent in the juvenile system. *See* Ala.Code 13A-11-72(a)(1) (prohibiting possession of firearm by certain felons); Ala.Code 13A-11-72(h)(1) (defining conviction without reference to juvenile proceedings); Ala.Code 12-15-220(a) ("An order of disposition or other adjudication in a proceeding [in juvenile court for delinquency] shall not be considered to be a conviction or impose any civil disabilities ordinarily resulting from a conviction of a crime").

2. **Arkansas** law provides that, in general, "no person shall possess or own any firearm who has been: (1) Convicted of a felony; (2) Adjudicated mentally ill; or (3) Committed involuntarily to any mental institution." Ark.Code Ann. 5-73-103(a). The statute does not include juvenile delinquency adjudications in its definition of "conviction" or "felony." Ark.Code Ann. 5-73-103(b) and (e). Generally, Arkansas law does not consider a juvenile delinquency adjudication to be a criminal

conviction. *See Vanesch v. State*, 343 Ark. 381, 390 (2001) ("A juvenile delinquency adjudication is not a conviction of a felony, and it is not a finding of guilt of a felony."); *see* Ark.Code Ann. 5-73-130(a) ("If a person under eighteen (18) years of age is unlawfully in possession of a firearm, the firearm shall be seized and, after an adjudication of delinquency *or* a conviction, is subject to forfeiture." (Emphasis added.)).

3. **Colorado** law makes "possession of a weapon by a previous offender" a crime. Colo.Rev.Stat. 18-12-108. The category of "previous offenders" subject to punishment includes an individual who "knowingly possesses, uses, or carries upon his or her person a firearm . . . subsequent to the person's adjudication for an act which, if committed by an adult, would constitute a felony crime," as that term is defined in either of two statutory provisions. Colo.Rev.Stat. 18-12-108(3)(a). The lists defining what makes a "felony crime" are very long, but neither includes controlled-substances or drug offenses, apart from "[a]ggravated robbery of controlled substances." Colo.Rev.Stat. 24-4.1-302(1)(v); *see generally* Colo.Rev.Stat. 18-12-108(7) and 24-4.1-302(1).

4. **The District of Columbia** prohibits individuals from owning, keeping, or possessing a firearm if they have "been convicted in any court of a crime punishable by imprisonment for a term exceeding one year." D.C. Code 22-4503(a)(1). An "order of adjudication" stemming from a delinquency proceeding "is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction," apart from the revocation of a driver's license, where applicable. D.C. Code 16-2318.

5. **Georgia** law states that "[a]ny person who . . . has been convicted of a felony . . . and who receives, possesses, or transports a firearm commits a felony." Ga.Code Ann. 16-11-131(b). However, "[a]n order of disposition or adjudication" following a delinquency hearing "shall not be a conviction of a crime and shall not impose any civil disability ordinarily resulting from a conviction." Ga.Code Ann. 15-11-606.

6. **Idaho** law makes it a felony for any "person who previously has been convicted of a felony" to "purchase[], own[], possess[], or ha[ve] under his custody or control any firearm." Idaho Code 18-3316. But it appears that an adjudication for a delinquent act is generally not considered a criminal conviction under Idaho law. *See*, *e.g.*, Idaho Code 18-8410 (distinguishing between the two by providing circumstances when "the court shall order that [a] delinquent act be deemed an adult criminal conviction" for sex-offender registry purposes).

7. **Indiana** law prohibits the carrying of a handgun by a "person who is less than . . . twenty-three (23) years of age and has an adjudication as a delinquent child for" acts that would constitute a "serious violent felony," Ind.Code 35-47-2-1.5(b)(10)(B), a category of offense that includes dealing in at least some controlled substances, Ind.Code 35-47-4-5(b)(27)-(b)(32). It also generally prohibits an individual, who was "adjudicated a delinquent child for committing an act while armed with a firearm that would be a serious violent felony if committed by an adult," from "knowingly or intentionally possess[ing] a firearm" until they are either 26 or 28, depending on the level of the prior offense. Ind.Code 35-47-4-9. No Indiana statute appears to prohibit an individual adjudicated delinquent for an unarmed drug offense from carrying a rifle or from simply *possessing* (but not carrying) a handgun. *See* Ind.Code 35-47-4-5(a) and (c) (criminalizing possession

of a firearm generally only for those who were previously convicted of, not adjudicated delinquent for, a "serious violent felony"); Ind.Code 35-47-2-1(c) (excluding numerous fact patterns, including carrying on one's own property, from Indiana's prohibition on the carrying of handguns).

8. **Michigan** law provides that "a person convicted of a felony shall not possess, use, transport, sell, purchase, carry, ship, receive, or distribute a firearm" for either three or five years after that person has (a) "paid all fines imposed," (b) "served all terms of imprisonment imposed," and (c) "successfully completed all conditions of probation or parole imposed." Mich.Comp.Laws 750.224f(1). A juvenile adjudication only becomes a "criminal proceeding[]" that can result in a "judgment of conviction" if it is "designate[d] . . . as a case in which the juvenile is to be tried in the same manner as an adult." Mich.Comp.Laws 712A.2d(1) and (7).

9. **Minnesota** law indefinitely prohibits persons "adjudicated delinquent . . . for a crime of violence" from possessing a firearm. Minn.Stat. 260B.245(1)(b). Individuals who have been adjudicated delinquent for drug and other nonviolent felonies are not disarmed.

10. **Mississippi** prohibits persons "convicted of a felony" from possessing firearms. Miss.Code 97-37-5(1). Nothing in the law prohibits possession by adults with prior juvenile delinquency adjudications.

11. **Missouri** law makes it illegal for an individual to "knowingly ha[ve] any firearm in his or her possession," if he or she "has been convicted of a felony under" Missouri law or of a comparable crime under the law of another state. Mo.Rev.Stat. 571.070. Although this would include nonviolent felonies, no mention is made of individuals adjudicated delinquent.

12. **Montana** law only prohibits possession of a firearm for a person previously convicted of a felony for which they received an additional sentence based on a dangerous-weapon specification, "a felony for which the person is currently required to register for the sexual or violent offender registry," or a comparable crime under the laws of another state. Mont.Code Ann. 45-8-313. No mention is made of juvenile delinquency adjudications—even for those crimes specified above.

13. **Nevada** generally prohibits individuals from possessing firearms if they have "been convicted of a felony." Nev.Rev.Stat.Ann. 202.360(1)(b). However, the statute does not include individuals adjudicated delinquent for such conduct. When Nevada wishes to include delinquency adjudications under the umbrella of "convictions," it does so expressly. *See*, *e.g.*, Nev.Rev.Stat.Ann. 202.885(3)(b)(3).

14. **New Hampshire** prohibits an individual convicted of a controlled-substances felony to "[o]wn[] or ha[ve] in his possession or under his control, a pistol, revolver, or other firearm." N.H.Rev.Stat.Ann. 159:3(I)(a) and (b)(2). There is no mention of juvenile delinquency or a juvenile delinquency adjudication in the disarming statutes. Compare N.H.Rev.Stat.Ann. 651-B:1(XI)(a) (treating a "conviction" and an "adjudication as a juvenile delinquent" as separate in sex-offender registration context).

15. **New Jersey** law prohibits "any person who has been convicted of an offense, or an attempt or conspiracy to commit an offense, for the unlawful use, possession or

sale of a controlled dangerous substance" from possessing a firearm. N.J.Stat.Ann. 2C:39-7(a). But New Jersey law does not view juvenile delinquency adjudications as "convictions." *See In re Registrant R.H.*, 258 N.J. 1, 13 (2024) ("[I]n our system, adults and some juveniles are 'convicted,' while other juveniles are 'adjudicated delinquent.' The two concepts are distinct in law and practice."). While it does not criminalize possession, New Jersey law does prohibit the *sale* of firearms to individuals with juvenile delinquency adjudications for weapons-based offenses. *See* N.J.Stat.Ann. 2C:58-3(c)(7).

16. **New Mexico** prohibits an individual "convicted of a felony offense" from possessing a firearm if "less than ten years have passed since the person completed serving a sentence or period of probation for the felony conviction." N.M.Stat.Ann. 30-7-16(A)(1) and (E)(3). The disarming statute makes no mention of delinquency adjudications, and, in New Mexico, such adjudications "shall not be deemed a conviction of crime nor shall it impose any civil disabilities ordinarily resulting from conviction of a crime." N.M.Stat.Ann. 32A-2-18(A).

17. **New York** prohibits an individual from possessing a firearm if they have "been previously convicted of a felony or a class A misdemeanor. . . within . . . five years" and the possession "did not take place in the person's home or place of business." N.Y.Penal Law 265.02(5)(ii) (Consol. 2024). New York does not treat delinquency as a criminal conviction. *See People v. Gray*, 84 N.Y.2d 709, 712 (1995) ("It is, however, impermissible to use a youthful offender or juvenile delinquency adjudication as an impeachment weapon, because these adjudications are not convictions of a crime . . . ." (Cleaned up.)).

18. **North Carolina** law makes it "unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm." N.C.Gen.Stat. 14-415.1(a). However, North Carolina expressly distinguishes between criminal convictions and delinquency adjudications: "An adjudication that a juvenile is delinquent or commitment of a juvenile to the Division for placement in a youth development center shall neither be considered conviction of any criminal offense nor cause the juvenile to forfeit any citizenship rights." N.C.Gen.Stat. 7B-2412.

19. **Pennsylvania** law prohibits persons adjudicated delinquent for certain felonious conduct from possessing firearms. 18 Pa.Cons.Stat.Ann. 6105(b), (c)(7), and (c)(8). While the lists of qualifying offenses are quite long, they do not include controlled-substances offenses. Further, the disability for less-dangerous offenses lapses either 15 years after the juvenile adjudication, or upon the disabled party turning 30, "whichever is earlier." 18 Pa.Cons.Stat.Ann. 6105(c)(8).

20. **Rhode Island** disarms individuals who have "been convicted . . . of a crime of violence," or of certain domestic-violence and harassment-related crimes. R.I.Gen.Laws 11-47-5(a)(1), (3), and (4). The disarming statute does not expressly include juvenile delinquency adjudications, and Rhode Island law provides that a juvenile adjudication shall not "impose any of the civil disabilities ordinarily resulting from a conviction, nor shall any child be deemed a criminal by reason of that adjudication, nor shall that adjudication be deemed a conviction." R.I.Gen.Laws 14-1-40(a).

21. **South Carolina** makes it "unlawful for a person who has been convicted of a crime punishable by a maximum term of imprisonment of more than one year to possess a firearm or ammunition." S.C.Code Ann. 16-23-500(A) (2024). But "[n]o adjudication by the court of the status of a child," including a delinquency adjudication, "is a conviction, nor does the adjudication operate to impose civil disabilities ordinarily resulting from conviction." S.C.Code Ann. 63-19-1410(C).

22. **South Dakota** disarms those "convicted . . . of a crime of violence" or certain other felonies—including several controlled-substances offenses—for a period of 15 years following their "discharge[] from prison, jail, probation, or parole." S.D.Codified Laws 22-14-15. However, if the underlying crime was mere possession of a controlled substance, the period of disarmament is only five years. S.D.Codified Laws 22-14-15.1. But South Dakota does not consider a juvenile adjudication to be a conviction. *See In re M.D.D.*, 2009 S.D. 94, ¶ 5 ("In juvenile proceedings there are no criminal activities, crimes, pleas of guilty, verdicts of guilty, or defendants. Instead, an alleged 'delinquent child' may be subject to an 'adjudication and disposition' and can only admit or deny a juvenile petition.").

23. **Tennessee** law requires a court to enter an order prohibiting a "juvenile from purchasing or possessing a firearm until the juvenile reaches twenty-five (25) years of age," but only if the juvenile is adjudicated delinquent of certain offenses, including aggravated assault, homicide, robbery, burglary, aggravated cruelty to animals, threat of mass violence, or any other criminal offense involving the use or display of a firearm. Tenn.Code Ann. 37-1-190(a). Unarmed drug felonies are not included.

24. **Texas**'s statutes provide that a "person who has been convicted of a felony commits an offense if he possesses a firearm" in any place for the first five years following his sentence, or outside his home after that five-year period. Tex.Penal Code 46.04(a). However, an adjudication of delinquency "is not a conviction of crime" in Texas, except as used in certain, specified offense- and sentence-enhancement provisions. Tex.Fam.Code 51.13(a), (d), and (e). And such "an order of adjudication or disposition does not impose any civil disability ordinarily resulting from a conviction," other than under Texas's sexually-violent-predator statutes. Tex.Fam.Code 51.13(a), referencing Tex.Health & Safety Code, Ch. 841. Thus, when Texas wishes to strip rights—including firearm rights—based on a delinquency adjudication, it does so expressly, as when it prohibits the issuance of a "license to carry a handgun," not only to any person "convicted of a felony," but also to any person who has, "in the 10 years preceding the date of application, been adjudicated as having engaged in delinquent conduct violating a penal law of the grade of felony." Tex.Govt.Code 411.172(a)(3) and (a)(13). There is no comparable language in Tex.Penal Code, Ch. 46, the chapter containing Texas's weapons offenses, including its felon-in-possession statutes.

25. **Vermont** provides that a "person shall not possess a firearm if the person has been convicted of a violent crime." Vt.Stat.Ann., Title 13, Section 4017(a). "Violent crime" does include selling, trafficking, or possessing with intent to distribute certain controlled substances. Vt.Stat.Ann., Title 13, Section 4017(d)(3)(C) and (d)(3)(D). But a delinquency adjudication is not "deemed a conviction of crime" in Vermont, and does not "impose any civil disabilities sanctions ordinarily resulting from a conviction." Vt.Stat.Ann., Title 33, Section 5202(a)(1)(A) and (a)(1)(B).

However, the juvenile court may, as a condition of juvenile probation, prohibit an individual from possessing a firearm "unless granted written permission by the court or juvenile probation officer." Vt.Stat.Ann., Title 33, Section 5262(b)(4).

26. **West Virginia** law makes it a misdemeanor for a person to "possess a firearm," if that person "[h]as been convicted in any court of a crime punishable by imprisonment for a term exceeding one year." W.Va.Code 61-7-7(a)(1). It also makes it a felony for a person "[w]ho has been convicted. . . of a felony controlled substance offense involving" certain substances (but not marijuana) to "possess[] a firearm." W.Va.Code 61-7-7(b)(2). But no "adjudication upon the status of any child by a juvenile court," including an adjudication of delinquency, may "operate to impose any of the civil disabilities ordinarily imposed by conviction, nor may any child be deemed a criminal by reason of the adjudication, nor may the adjudication be deemed a conviction." W.Va.Code 49-4-103.

27. **Wyoming** makes it a misdemeanor for individuals "who ha[ve] previously pleaded guilty to or been convicted of committing or attempting to commit a felony" to "use[] or knowingly possess[] any firearm," and a felony for those who have "previously pleaded guilty to or been convicted of committing or attempting to commit a *violent* felony" from doing the same. (Emphasis added.) Wyo.Stat. 6-8-102(a) and (c). But "[n]o order or decree pursuant to" Wyoming's Juvenile Justice Act, including a delinquency adjudication, "shall be deemed a conviction of a crime or impose any civil disabilities." Wyo.Stat. 14-6-238; *see* Wyo.Stat. 14-6-201(a)(xxix) and (b) (defining the Juvenile Justice Act and "this act" to mean Wyo.Stat. 14-6-201 through 14-6-252); *see also* Wyo.Stat. 14-6-211 and 14-6-229 (discussing delinquency proceedings).